In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2298

DORIS KEETON,

*Plaintiff-Appellant,*

*v.*

MORNINGSTAR, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10-cv-05502—**Amy J. St. Eve,** *Judge.*

ARGUED DECEMBER 8, 2011—DECIDED JANUARY 13, 2012

Before MANION, ROVNER and TINDER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Doris Keeton filed an employment discrimination suit against her employer, Morningstar, Inc., alleging race discrimination and retaliation in violation of 42 U.S.C. § 1981 and 42 U.S.C. § 2000e, *et seq.* Keeton failed to file a timely response to Morningstar's motion for summary judgment, and the court granted judgment in favor of Morningstar. Keeton contends that the court erred in refusing to accept her late filing of a response to Morningstar's

motion, and that Morningstar was not entitled to summary judgment. We affirm.

## I.

Because Keeton failed to file a response to Morningstar's Local Rule 56.1 statement of facts in the district court, we credit Morningstar's uncontroverted version of the facts to the extent that it is supported by evidence in the record. *FTC v. Bay Area Business Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005) (when a party fails to comply with the local rule requiring a response to a statement of undisputed material facts, the court may rely on the opposing party's statement to the extent that it is supported by citations to relevant evidence in the record). Morningstar is a company that provides independent investment research. Keeton, who is African-American, began working for the company in August 2002 as a "Compliance Consultant" in the legal department. The company also employed two other Compliance Consultants, Lisa Derner and Rita Bentzler, who are both white. All three reported to Morningstar's Chief Compliance Officer, Scott Schilling. Each Compliance Consultant was assigned to one of Morningstar's three subsidiaries. Keeton was assigned to Ibbotson Associates. As a Compliance Consultant, Keeton was charged with ensuring that Ibbotson complied with all federal securities laws.

When hiring new employees, Morningstar determines its initial salary offers based on market factors, including the availability of qualified candidates and their salary

requirements. The company does not have formal policies in place for determining salaries of Compliance Consultants, but generally does not factor seniority into salary decisions. All three Compliance Consultants were lateral hires with several years of experience at other firms before coming to Morningstar. All three were offered higher base salaries than they were making with their former employers. Derner was the last of the three to join Morningstar. At the time of Derner's hiring in April 2008, Keeton had a base salary of $68,000 and Bentzler was earning $65,000. Derner, who earned $68,000 per year at her former employer, demanded a base salary of $70,000, and Morningstar met the demand.

In February 2010, Morningstar's General Counsel sought Schilling's input regarding potential salary increases for the three Compliance Consultants. Based on their 2009 performance evaluations, Schilling recommended salary increases for all three women, but suggested to the General Counsel that Keeton receive the smallest increase because her performance review identified several areas for improvement. As of July 2010, Keeton's base salary was raised to $70,000, Derner's salary was increased to $73,000 and Bentzler's salary was set at $70,150. Keeton thus went from the middle of the group to the bottom by $150 per year.

In February 2010, Keeton and Bentzler each complained to company management about the other. Keeton first reported to Schilling and to Morningstar's human resources director, Cathi Rezy, that Bentzler was watching her and keeping track of her activities on a

yellow notepad. Rezy investigated the complaint and interviewed Bentzler but never found the notepad. Subsequently, Bentzler complained that Keeton was engaged in workplace misconduct. Rezy did not interview Keeton regarding Bentzler's allegations, but no action was ever taken against Keeton because of Bentzler's complaint. Morningstar resolved the dispute between the two employees by allowing them to work away from each other, with personnel from their assigned subsidiaries rather then with the compliance team. Keeton believed that Morningstar's management displayed favoritism towards Bentzler during these incidents by spending more time speaking with her and consoling her. Keeton also found the workplace more tense after these incidents.

Approximately one month later, in March 2010, Keeton went on disability leave for a medical problem unrelated to the lawsuit. In June 2010, Keeton filed a complaint with the Equal Opportunity Employment Commission ("EEOC"), alleging for the first time that the company discriminated against her on the basis of race by paying her less than a non-minority co-worker who had less seniority and fewer qualifications. After receiving her right-to-sue letter from the EEOC, Keeton filed this lawsuit in August 2010. In her complaint, Keeton alleged that Morningstar discriminated against her by paying her less than similarly situated white employees, and that the company retaliated against her when she complained about being treated differently than her white co-workers. In November 2010, Keeton responded to a discovery request by producing docu-

ments to Morningstar. The documents included a number of private, confidential emails among and between other Morningstar employees, including attorney-client privileged documents. Morningstar conducted an investigation to determine how Keeton came to be in possession of these documents. In January 2011, in response to questions from an internal auditor at Morningstar, Keeton stated that she came across the emails while using Morningstar's email surveillance software for legitimate business purposes. Morningstar concluded its investigation with a determination that, although Keeton did not have the authority to access the emails and had used poor judgment in her use of the surveillance software, she had not intended to violate company policy. Morningstar therefore took no disciplinary action against Keeton on the basis of this incident. Keeton amended her complaint after this incident to add a count for retaliation based on Morningstar's actions in investigating the email matter.

On March 25, 2011, after the close of discovery, Morningstar moved for summary judgment. The district court set a briefing schedule that required Keeton to respond to the motion by May 3, 2011, and Morningstar to reply by May 17, 2011. The deadline that the court set for Keeton's response came and went with no acknowledgement or action from Keeton. Nine days later, on May 12, the district court contacted Keeton's attorney to determine whether Keeton intended to file a response. Keeton's attorney assured the court that a response would be filed the following day, May 13. No brief was filed on May 13. Ten days later, on May 23,

the district court entered judgment in favor of Morningstar. Twenty-three minutes before the court entered its order granting judgment, Keeton filed a motion for leave to file her summary judgment response *instanter*. Later that afternoon, the court denied Keeton's motion as moot. Keeton appeals.

## II.

On appeal, Keeton contends that the district court erred in denying as moot her motion for leave to file her summary judgment response *instanter*. Keeton also contests the court's judgment on the merits.

### A.

Keeton argues that the court clearly erred when it ruled that her motion for leave to file her summary judgment response was moot. She contends that a case is moot only when there are no live issues. Her case was not moot, she continues, because her motion was filed *before* the court granted judgment in favor of Morningstar. It is true that a case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. *United States Parole Commission v. Geraghty*, 445 U.S. 388, 396 (1980); *Gates v. City of Chicago*, 623 F.3d 389, 413 (7th Cir. 2010). But Keeton fundamentally misunderstands the district court's action and the meaning of the court's words. The court did not find that the *case* was moot in the sense that it was non-justiciable or that the court lacked

jurisdiction over the claims. Indeed, the court decided the case on the merits.

The court found instead that Keeton's *motion* was moot in the procedural sense because it came too late. The court's entry of the judgment and Keeton's filing of her motion occurred virtually simultaneously. The docketing of the motion and the docketing of the court's judgment were separated by a mere twenty-three minutes. Although there is no way to tell from the docket whether the court became aware of Keeton's motion before or after the entry of the judgment, the end result is the same. The parties agree that the motion was filed *before* the judgment was entered. "Final judgment necessarily denies pending motions[.]" *Dunn v. Truck World, Inc.*, 929 F.2d 311, 313 (7th Cir. 1991). Thus, Keeton's motion to file a summary judgment response was implicitly denied by the final judgment. The court's Memorandum Opinion and Order may also be read as denying Keeton's motion and disposing of any pending motions. *See Keeton v. Morningstar, Inc.*, 2011 WL 1990448 (May 23, 2011) (hereafter "Opinion"). The court granted Morningstar's motion for summary judgment and "dismisse[d] this lawsuit in its entirety." Opinion, at *1. Moreover, in a footnote, the court specified that it would deem admitted the defendant's Local Rule 56.1(a)(3) statement of facts because Keeton had failed to file a Local Rule 56.1(b)(3) response. Opinion, at *1 n.1. If any doubt remained that the court was denying the pending motion, the minute order accompanying the Opinion stated that "[a]ll pending dates and deadlines are stricken." R. 45. In an apparent abundance

of caution, the court, later that afternoon, made an additional entry on the docket, denying Keeton's motion to file her summary judgment response *instanter* as "moot," and clarifying that the parties need not appear on June 1, 2011, the date specified in Keeton's Notice of Motion. R. 8. Given that the final judgment had already effected the denial of Keeton's motion, that final docket entry accurately described the motion as procedurally moot. The court's final docket entry also confirms that the result would be the same whether the court became aware of Keeton's motion before or after entering its order on summary judgment. By adding to the docket an express ruling on the motion, the court clarified for the parties and for this court that the motion, filed so close in time to the judgment, was not simply overlooked but was denied on its merits.

The only question remaining is whether the district court abused its discretion in denying Keeton's motion for leave to file her summary judgment response *instanter*. *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 606 (7th Cir. 2006). Federal Rule of Civil Procedure 6(b) gives courts discretion (with certain exceptions not applicable here) to grant extensions of time when deadlines are missed because of excusable neglect. *See* Fed. R. Civ. P. 6(b)(1)(B) ("When an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect."); *Raymond*, 442 F.3d at 606. In his motion for leave to file Keeton's summary judgment response *instanter*, Keeton's lawyer stated that he was "unable to file her Response

timely for the following reasons." Counsel then listed twenty-two dates between April 11 and May 16, 2011, along with nothing more than case or client names and courts. We presume he meant that his obligations in these other matters kept him from complying with the May 3, 2011 deadline in this case. But "it is widely accepted that neglect due to a busy schedule is not excusable." *Harrington v. City of Chicago*, 433 F.3d 542, 548 (7th Cir. 2006). Moreover, counsel does not explain why he was unable to work on the response from March 3, when Morningstar filed its motion, until April 11, when counsel apparently became very busy with other cases. The motion also references a medical emergency counsel suffered on May 16, 2011, when, after experiencing pain in his right arm, he was diagnosed with a broken arm. Counsel explained that he is right-handed and that his ability to type pleadings was impaired during this time. Although a medical emergency could cause excusable neglect, counsel failed to demonstrate that his illness was of such a magnitude that he could not, at a minimum, request an extension of time to file his response. *See Dickerson v. Board of Educ. of Ford Heights, Ill.*, 32 F.3d 1114, 1118 (7th Cir. 1994) (severe illness may constitute excusable neglect for failure to file a timely appeal). Indeed, from the face of his motion, it is apparent that he was actively representing other clients until May 16. Moreover, when the court called counsel on May 12 to inquire whether a response was forthcoming, counsel gave no indication that anything was amiss, and instead affirmatively represented that the response would be filed the next day. When the

response was still not filed ten days later, the court was well within its discretion to deny the motion for leave to file the summary judgment response *instanter*. *See Raymond*, 442 F.3d at 604 (district courts are entitled to expect strict compliance with Local Rule 56.1).

Clearly, the court did not draft its well-reasoned, eleven-page Opinion and the accompanying judgment in the twenty-three minutes after Keeton filed her motion. The court had already gone through the effort of analyzing the case and drafting its summary judgment Opinion before Keeton's lawyer attempted to file a late response. The court had allowed Keeton more than two months to respond to the motion, and had given counsel a generous second chance to comply with the court's deadline. Counsel had already failed to appear at a status hearing and also failed to complete discovery within the allotted time. Instead, after Morningstar moved for summary judgment and more than a month after the close of discovery, counsel moved to reopen discovery and readjust all deadlines. District courts have considerable discretion to manage their dockets and to require compliance with deadlines. *Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1030 (7th Cir. 1998); *Reales v. Consolidated Rail Corp.*, 84 F.3d 993, 996 (7th Cir. 1996). Under the circumstances, the court was well within its discretion to refuse to allow Keeton's late filing of her response to Morningstar's motion for summary judgment.

**B.**

We turn to the merits of the court's summary judgment ruling, which we review *de novo*. *Norman-Nunnery v. Madison Area Technical Coll.*, 625 F.3d 422, 428 (7th Cir. 2010). As we noted above, because Keeton failed to timely respond to Morningstar's Local Rule 56.1 statement of uncontested facts, we deem those facts admitted to the extent that Morningstar's statement is supported by evidence in the record. *Bay Area Business Council*, 423 F.3d at 634; *Raymond*, 442 F.3d at 608. "However, a nonmovant's failure to respond to a summary judgment motion, or failure to comply with Local Rule 56.1, does not, of course, automatically result in judgment for the movant." *Raymond*, 442 F.3d at 608; *Reales*, 84 F.3d at 997. Morningstar must still demonstrate that it is entitled to judgment as a matter of law. *Raymond*, 442 F.3d at 608. Although Keeton has not provided her own version of the facts, we still view all of the facts asserted by Morningstar in the light most favorable to Keeton, the nonmoving party, and we draw all reasonable inferences in her favor. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 937 (7th Cir. 2003); *Curran v. Kwon*, 153 F.3d 481, 485-86 (7th Cir. 1998).

Our review of the record reveals that there is no direct evidence of discrimination or retaliation. We therefore will employ the burden-shifting analysis set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the burden-shifting analysis, a plaintiff must first establish a *prima facie* case of discrimination by demonstrating that (1) she is a member of a protected

class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable treatment. *Everroad v. Scott Truck Systems, Inc.*, 604 F.3d 471, 477 (7th Cir. 2010); *Lucas v. PyraMax Bank, FSB*, 539 F.3d 661, 666 (7th Cir. 2008). If the plaintiff establishes a *prima facie* case of discrimination, the burden then shifts to the employer to offer a non-discriminatory reason for the adverse employment action. *Everroad*, 604 F.3d at 477. If the employer does so, the burden shifts back to the plaintiff to submit evidence demonstrating that the employer's explanation is a pretext. *Everroad*, 604 F.3d at 477; *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008). Although the question of pretext normally arises only after the plaintiff has established a *prima facie* case of discrimination and the employer has countered with a legitimate non-discriminatory reason for the adverse action, we may skip over the initial burden-shifting of the indirect method and focus on the question of pretext. *Everroad*, 604 F.3d at 478; *Bodenstab v. County of Cook*, 569 F.3d 651, 657 (7th Cir. 2009), *cert. denied*, 130 S. Ct. 1059 (2010).

Morningstar presented evidence of legitimate, non-discriminatory reasons for any salary differences among the Compliance Consultants. In particular, Morningstar asserted that Keeton's base salary was lower than one of her white co-workers (recall that initially Keeton earned more than one of her white counterparts and less than the other) because Morningstar set initial salaries based on market forces.

That is, Morningstar offered all three Compliance Consultants more than they had been earning at their prior positions in order to induce them to come to Morningstar. Market forces are a legitimate, non-discriminatory reason for differences in base salary for experienced, lateral hires. *See Cullen v. Indiana Univ. Bd. of Trs.*, 338 F.3d 693, 703 (7th Cir. 2003). When Morningstar increased the salaries of the three Compliance Consultants, it did so based on performance reviews, another legitimate, non-discriminatory reason for the differences in pay. To demonstrate pretext, Keeton must show that her employer did not honestly believe in the reasons it gave for setting salaries. *Everroad*, 604 F.3d at 478-79. But Keeton has no evidence that any of Morningstar's explanations are a pretext for race discrimination. Her discrimination claim therefore fails as a matter of law.

There is no direct evidence of retaliation and so we turn to the indirect proof analysis for those claims as well. In order to make out a claim for retaliation, Keeton must demonstrate that she engaged in statutorily protected activity, performed her job to her employer's legitimate expectations, suffered an adverse employment action, and was treated less favorably than similarly situated employees who did not engage in that protected activity. *Everroad*, 604 F.3d at 481; *Dear v. Shinseki*, 578 F.3d 605, 610-11 (7th Cir. 2009). Keeton's retaliation claims fail because she is unable to establish a *prima facie* case. For her claim of retaliation that occurred before she filed suit against Morningstar, she has produced no evidence that she engaged in protected

activity. For her claim of retaliation that occurred after she sued Morningstar, Keeton has offered no evidence that she suffered any adverse employment action. In the first incident, Keeton complained that a co-worker was taking notes about her activities. But when she reported this incident, she never alerted her employer that this incident was related to race. And when the same employee complained about Keeton, Morningstar investigated the claims, determined that they were unfounded and did not take any action against Keeton based on the accusations. Keeton never complained to her employer that any actions taken against her by co-workers or by anyone at Morningstar were related to race and nothing about the incidents themselves gave any hint that race was at issue. Thus, Keeton cannot show that she engaged in protected activity.

Keeton also alleges that the company retaliated against her when it investigated her for misuse of Morningstar's email surveillance software. In this instance, though, Keeton has no evidence that the investigation was anything other than a legitimate attempt to discover whether Keeton had misused the software. More importantly, no adverse action of any kind was taken against Keeton as a result of the investigation and the investigation itself was not an adverse action. The district court was therefore correct to grant judgment in favor of Morningstar on Keeton's retaliation claims.

### III.

In sum, the district court did not abuse its discretion when it denied Keeton's motion for leave to file a late

response to Morningstar's motion for summary judgment. The court correctly granted judgment in favor on Morningstar on Keeton's claim of discrimination because she failed to produce any evidence calling into question Morningstar's legitimate, non-discriminatory reasons for any salary differential between Keeton and her white co-workers. Finally, the court correctly granted judgment in favor of Morningstar on Keeton's retaliations claims for the reasons stated above.

AFFIRMED.