In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2496

ANTHONY SMITH and
FLYING A.J.'S TOWING COMPANY, LLC,

*Plaintiffs-Appellants,*

*v.*

JOHN WILSON, in his official capacity as
Police Chief and in his individual
capacity, and TOWN OF BELOIT, WISCONSIN,
a municipal corporation,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 10-cv-062-wmc—**William M. Conley**, *Chief Judge.*

ARGUED SEPTEMBER 12, 2012—DECIDED JANUARY 23, 2013

Before FLAUM, WOOD, and HAMILTON, *Circuit Judges.*

WOOD, *Circuit Judge.* For the better part of a decade, Anthony Smith sought a place on the Town of Beloit's "tow list," hoping to be called upon when the local

police department required towing services. Chief of Police John Wilson denied these requests, and Smith (who is African-American) attributed his exclusion to racial bias. In December 2008, Wilson's subordinates came forward with allegations that appeared to confirm Smith's suspicions: in everyday conversation, Wilson repeatedly referred to people of color as "niggers," "sand-niggers," "towel heads," and "spics." Several officers specifically recalled that Wilson used such slurs in conversations about Smith.

Smith filed racial discrimination claims against Wilson and the Town of Beloit under Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*), 42 U.S.C. § 1981, and 42 U.S.C. § 1983. Following a three-day trial, a jury returned a verdict finding that race was a "motivating factor" in Wilson's decision not to include Smith on the list. The jury also found, however, that Wilson would not have added Smith to the list even if race had played no part in Wilson's thinking. The district court concluded that this mixed verdict precluded Smith's requested relief and entered judgment for the defendants.

Smith raises three main issues on appeal. First, he argues that he is entitled to a new trial because the jury's second finding—that his company would have been left off the tow list even had race not been a "motivating factor" in Wilson's decision—was contrary to the manifest weight of the evidence. Second, even if that determination stands, Smith contends that he is entitled to some relief because he succeeded in demonstrating

that improper racial considerations at least partially motivated Wilson. Finally, Smith urges that the district court's instruction on the allocation of the burden of persuasion was incorrect. Notwithstanding the staggering and regrettable evidence of racial bigotry presented at trial, we conclude that the district court properly entered judgment for the defendants.

## I

Smith first wrote to the Town of Beloit in 2002 to offer the services of his newly founded company, Flying A.J.'s Towing. These initial efforts bore little fruit, but on May 19, 2003, Wilson became Beloit's new police chief, and Smith heard that Wilson was planning to shake up the Town's tow list. Smith called Wilson in June 2003 to renew his offer.

The parties offer conflicting accounts of this phone conversation. According to Smith, Wilson confirmed that the police department was revising the Town's tow list and promised to be in touch with Smith as the process moved forward. Wilson denies telling Smith that he was revisiting the tow list and maintains that he explained to Smith that he was satisfied with the three companies (Ace Towing, Dewey Towing, and D&J Towing) the Town already used.

Immediately after the 2003 phone call, Wilson surveyed his officers to find out if anyone was familiar with Smith or his tow company. One officer told Wilson of rumors that Smith was involved in drug dealing.

Another officer who overheard the exchange testified that Wilson responded, "That settles it then, that fucking nigger isn't going to tow for us." Though denying the expletive, Wilson concedes that he made the rest of the remark.

This was not the only time Wilson used such language in reference to Smith. Smith testified that he made 25-40 requests—both verbally and in writing—for inclusion on the list between 2003 and 2010. Several officers confirmed that Smith regularly inquired about the list when their paths crossed. When these officers relayed Smith's inquiries, Wilson's response was blunt and unambiguous: "[T]hat stupid nigger isn't going to work or tow for me"; "I'm not letting that goddamn nigger tow for us"; "That goddamn nigger is not towing for us and that's the bottom line"; "I'm not going to put that fucking nigger on the tow list." Wilson concedes making some of these comments; he estimates that he used the term "nigger" to refer to Smith "probably less than ten" times between 2003 and 2011.

Such racism was, unfortunately, not aberrational during Wilson's tenure as police chief. One officer testified that Wilson instructed him to "keep the blacks out of the Town of Beloit" by ticketing and towing their cars across the Town's borders. The municipal court clerk testified that she heard Wilson use the word "nigger"—as well as other racial slurs for black, Latino, and Arab residents—hundreds of times. Wilson himself acknowledged that there was a "free-flowing use of racial slurs" in the Town's police department throughout the relevant period.

As police chief, Wilson was in charge of the Town's tow list, and he made several minor changes to its composition between 2003 and his retirement in 2011. In 2004, he reduced the list from three companies to two after an officer complained that one of the companies (Ace Towing) had damaged a car. Smith asserts that he spoke with Wilson after learning of Ace's removal; Wilson denies such a conversation took place. Wilson also became dissatisfied with Dewey Towing in 2008 and temporarily demoted it from the "primary tow" position to the "secondary tow" position. Soon thereafter, Wilson implemented a "rotational system" that split responsibilities evenly between Dewey and D&J Towing. Wilson did not add any companies during the relevant period.

In 2010, Smith and Flying A.J.'s filed suit against Wilson, in his individual and official capacities, and the Town of Beloit. (For simplicity, we refer to the plaintiffs as "Smith.") Following the jury's finding that Smith would have been excluded from the tow list even if he were white, the district judge solicited post-trial briefing from the parties. Smith argued that he was entitled to a judgment based on the verdict, and he also filed a motion for a new trial on damages or in the alternative on all issues. The district court rejected these arguments, finding that the mixed verdict "legally bars *all* of plaintiffs' requested relief." The district judge nevertheless acknowledged how "painful [it must be] to learn that one's worst suspicions are true when it comes to the motives of a public official, particularly if the official is the chief of police." It concluded its opinion with

an admonishment that bears repeating: "Regardless of the outcome here, the jury's finding of a racial motive should elicit embarrassment—not a sense of vindication—on the part of defendants."

## II

We begin with Smith's challenge to the evidentiary support for the jury's verdict—in particular, for its affirmative answer to Question No. 2 on the special verdict form, which asked "Even if race were not a motivating factor, would Wilson still have denied plaintiffs an opportunity to apply for inclusion on the Town's towing list?" Bearing in mind that a verdict may be set aside only if "no rational jury could have rendered" it, we conclude that the district court did not abuse its discretion in denying a new trial on this ground. *Lewis v. City of Chicago Police Dep't*, 590 F.3d 427, 444 (7th Cir. 2009) (quoting *Moore ex rel. Estate of Grady v. Truelja*, 546 F.3d 423, 427 (7th Cir. 2008); see also *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006) (same).

While the overwhelming evidence of Wilson's racism certainly could have allowed a jury to attribute Smith's exclusion solely to race, it was not irrational for this jury to reach a contrary conclusion. The defendants presented testimony that Wilson inherited a satisfactory tow list in 2003 and that he had no reason to supplement the roster with additional companies. In 2004, Wilson removed Ace Towing from the list after receiving a complaint that the company damaged a vehicle, but there is no evidence that Wilson ever restored Ace or

any other company to the vacated position. (Plaintiffs repeatedly represented, both in their briefs and at oral argument, that "in 2005, Ace Towing was then put back on the list despite prior complaints." We can find no support in the record for this assertion, and so we do not rely on it to undermine the jury's verdict.) Wilson grew frustrated with Dewey in 2008, and Smith now argues that Wilson removed Dewey from the list before "re-adding" it. But there was also evidence that Wilson merely reconfigured the order of the two-company list in 2008, temporarily demoting Dewey without changing the composition of the list. Smith actually advanced this latter interpretation of events during his closing argument. In short, the jury was entitled to credit Wilson's testimony that he simply "didn't see any need to be putting on any more tow companies" after 2003.

The jury could have relied on evidence that another white-owned tow company, C&C Towing, unsuccessfully petitioned for a place on the tow list during part of the relevant period to buttress Wilson's explanation. The owner of C&C Towing testified that he stopped by the Town's police department repeatedly over three or four years, hoping to speak with someone about adding his company to the list, to no avail. This testimony, showing that Wilson also rebuffed entreaties from a similarly-situated white-owned tow company, also supports the jury's finding.

Somewhat more problematic are Wilson's additional reasons for refusing to consider Flying A.J.'s in particular. At trial, Wilson testified that immediately after his

initial 2003 conversation with Smith, Wilson asked his subordinates whether they were familiar with Smith's reputation. According to Wilson, one officer told him that the neighboring town's police department suspected Smith of drug dealing, and another officer later shared rumors that Smith overcharged clients. Wilson conceded that he conducted no further investigation and lacked any evidence corroborating these reports.

Plaintiffs attack these allegations as "hearsay" and "unsubstantiated rumors," arguing that a rational jury should not have been permitted to reach its verdict on the basis of such dubious evidence. We are mindful that certain ostensibly neutral bases for a hiring decision may be predicated on impermissible stereotypes and biases. See *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989) ("In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender."). Particularly when coupled with Wilson's racist disparagement of Smith, the purported link between Smith and drug dealing warrants skepticism. See David Rudovsky, *Law Enforcement by Stereotypes and Serendipity: Racial Profiling and Stops and Searches Without Cause*, 3 U. Pa. J. Const. L. 296, 306-17 (2001) (discussing policing based on stereotypes associating African-Americans and drugs). Were this the sole evidence in the defendants' favor, this would be a much closer case.

But the presumably false accusation that Smith had some association with drug-dealing did not stand alone;

it was coupled with a report of overcharging. Smith offers us no reason to characterize a concern about over-charging as a proxy for racial animus. We note as well that Smith misses the point when he characterizes the rumors as "hearsay": they were offered not to prove the truth of the matter asserted (*i.e.*, that Smith over-charged), but rather for the non-hearsay purpose of explaining Wilson's subsequent actions. FED. R. EVID. 801(c). Moreover, it was Smith, not the defendants, who elicited this allegedly improper evidence. If the jury credited Wilson when he said that he believed that Smith overcharged, it could have used that fact to support a finding that this assessment rather than racial bias accounted for Wilson's decision not to include Flying A.J.'s on the tow list.

In the final analysis, viewing the evidence in the light most favorable to the defendants, we conclude that a rational jury could have concluded that no matter how much racism Wilson exhibited, it was inertia, not racial bias, that accounted for Smith's exclusion from the Town's tow list.

## III

Smith next contends that the district court erred in concluding that the jury's mixed verdict precluded all of the relief he sought, and that the court erred in assigning the burden of proof for his various claims. These are related inquiries.

A.  "Motivating Factor" Relief

Smith argues that despite the jury's finding that Wilson would have denied him a place on the Town's towing list regardless of his race, he is still entitled to a partial recovery under Title VI, 42 U.S.C. § 1981, or 42 U.S.C. § 1983. The problem that he faces is that none of these laws explicitly authorizes relief where a plaintiff demonstrates only that race was a "motivating factor" for the adverse action.

Smith's request is based on an analogy to claims brought under Title VII, which prohibits employment discrimination "because of [an] individual's race." 42 U.S.C. § 2000e-2(a). In 1991, Congress amended Title VII to provide that an "unlawful employment practice" is established where a plaintiff demonstrates "that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). If an employer can establish that the same result would have obtained even "in the absence of the impermissible motivating factor," a court may still grant the plaintiff declaratory relief, injunctive relief, and attorney's fees and costs (but not damages). 42 U.S.C. § 2000e-5(g)(2)(B). Smith argues that because his discrimination claims share certain similarities to employment discrimination claims brought under Title VII, he is entitled to similar relief here.

The history of the Title VII amendments reveals why Smith's position is not well taken. In 1989, before the addition of the "motivating factor" language to Title VII,

the Supreme Court addressed in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), whether a plaintiff could recover under that statute if there were both proscribed and non-proscribed bases for an employment decision. The Court crafted a burden-shifting framework to govern such "mixed-motive" cases: a Title VII plaintiff who showed that an impermissible motive influenced an adverse employment decision "placed upon the defendant the burden to show that it would have made the same decision in the absence of the unlawful motive." *Id.* at 250. A defendant who made such a showing avoided liability altogether. *Id.* at 258. The Civil Rights Act of 1991, which amended Title VII and several other statutes, represented both a codification of this burden-shifting approach and a limited roll-back of *Price Waterhouse*'s complete defense to employer liability in mixed-motive situations.

As we explained in *McNutt v. Board of Trustees of the University of Illinois*, these amendments only partially abrogated *Price Waterhouse*: for employment discrimination claims falling outside the five categories specifically listed in 42 U.S.C. § 2000e-2(m), an employer's demonstration that the same result would have occurred without the "motivating factor" still constitutes a complete defense. 141 F.3d 706 (7th Cir. 1998). In *McNutt*, a jury found that an employer improperly retaliated against a Title VII plaintiff, but it also found that the plaintiff would have received the same job assignments even in the absence of the retaliatory motive. *Id.* at 707. The district court awarded the plaintiff attorney's fees and costs, despite the fact that § 2000e-2(m) makes

no mention of Title VII retaliation claims. *Id*. Acknowledging "compelling logical argument[s]" in favor of granting limited relief for all species of Title VII "motivating factor" claims, we nevertheless vacated the judgment. *Id*. at 709. Absent explicit statutory authorization, we said, the district courts are powerless to give such relief. *Id*. For the same reasons, we cannot import the authorization of partial "motivating-factor" relief found in § 2000e-2(m) into entirely different statutes—Title VI, § 1981, or § 1983. Accord *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957 (7th Cir. 2010) (rejecting award of injunctive relief, declaratory relief, and attorney's fees and costs for mixed-motive ADA claim).

## B.  Burden Shifting

Finally, Smith argues that even if his claims require a showing that Wilson's racial bias was outcome-determinative—*i.e.*, "but for" Smith's race, Wilson would have included Flying A.J.'s on the tow list—"[t]he district court [erred by] requir[ing] Plaintiffs to prove [such] 'but for' causation." In other words, according to Smith, even if partial "motivating-factor" recoveries are a creature of statute, a court should still shift the burden of persuasion to the defendants once the plaintiff establishes that an impermissible "motivating factor" influenced the adverse action. This line of argument is also unavailing.

Burden-shifting for mixed-motive claims outside the Title VII context became more common following *Price*

*Waterhouse*, but in 2009, the Supreme Court held that a mixed-motive jury instruction was never appropriate in a suit brought under the Age Discrimination in Employment Act (ADEA). *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). Focusing on the statutory text, which prohibits employment decisions "*because of* an individual's age," the Court concluded that the ADEA requires plaintiffs to prove "by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Id*. at 180. The *Gross* Court construed the words "because of" as colloquial shorthand for "but for" causation (interestingly, a position that a plurality of the Court had rejected two decades earlier in *Price Waterhouse*. 490 U.S. at 240).

In the immediate wake of *Gross*, we suggested that burden-shifting no longer would be appropriate for any mixed-motive discrimination claim unless a statute explicitly provides otherwise. *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009). We later extended *Gross*'s prohibition against burden-shifting to claims brought under the Americans with Disabilities Act (ADA) and retaliation claims brought under the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA). *Serwatka*, 591 F.3d at 963-64 (ADA); *Serafinn v. Local 722, Int'l Bhd. of Teamsters*, 597 F.3d 908 (7th Cir. 2010) (LMRDA).

In *Greene v. Doruff*, however, we attempted to clarify both what *Gross* requires and what its limits are. 660 F.3d 975, 978 (7th Cir. 2011) (noting circulation of opinion pursuant to Seventh Circuit Rule 40(e)). While acknowledging that "*Gross* may have implications for suits under

other statutes" beyond the ADEA, we held that *Gross* was "inapplicable" to suits "to enforce First Amendment rights." *Id*. at 977. See *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). *Greene* thus acknowledges that the Supreme Court has never abandoned the *Mt. Healthy* rule. This statute-by-statute approach is also faithful to the *Gross* Court's close scrutiny of the relevant text and its insistence that we not "apply rules applicable under one statute to a different statute without careful and critical examination." 557 U.S. at 174.

That said, we need not decide in the present case whether *Gross* foreclosed burden-shifting for claims under Title VI (prohibiting discrimination "on the ground of race") and § 1981 (guaranteeing "the same right . . . as is enjoyed by white citizens"). The reason is simple: rightly or wrongly, the district court assigned to the defendants the burden of disproving "but for" causation. The special verdict form asked the jury to answer "yes" or "no" to the following question:

> QUESTION NO. 2: Even if race were not a motivating factor, would Wilson still have denied plaintiffs an opportunity to apply for inclusion on the Town's towing list?

The court then instructed the jury that "the burden of proof is on the party contending that the answer to a question should be 'yes.'" The court made several passing statements throughout the trial that the plaintiffs bore the burden of proving their claims. Nevertheless,

taking the jury instructions as a whole as we must, see *Boyd v. Illinois State Police*, 384 F.3d 888, 894 (7th Cir. 2004), it is apparent that this jury was informed that the defendants bore the burden of persuasion on this point. If the district court erred in assigning this burden, Smith was not prejudiced by its mistake. *Id*.

Smith's Equal Protection claim under § 1983 requires separate consideration. Well before *Price Waterhouse* approved of burden-shifting in the Title VII context, federal courts used an identical framework to assess constitutional claims. See *Mt. Healthy*, 429 U.S. at 287; *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 271 n.21 (1977); *Hunter v. Underwood*, 471 U.S. 222, 228 (1985); *Board of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 674 (1996). In race discrimination cases, for example, once a plaintiff discharges her burden of establishing that a decision "was motivated in part by a racially discriminatory purpose," the burden shifts to the defendant to "establish[] that the same decision would have resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 271 n.21. In *Gross*, the plaintiff highlighted these constitutional cases, arguing that burden-shifting was equally appropriate in the ADEA context. Brief for Petitioner at 54-55, *Gross*, 2009 WL 208116. The Court responded by distinguishing "constitutional cases such as *Mt. Healthy*" from ADEA claims, for which the statutory text governs the assignment of the burden of persuasion. *Gross*, 557 U.S. at 179 n.6. It was on the basis of this distinction that we concluded in *Greene* that *Gross* "does not affect suits to enforce First Amend-

ment rights." The same conclusion logically follows for the Equal Protection Clause.

In contrast to its Title VI and § 1981 instructions, the district court's § 1983 instructions placed the burden of persuasion squarely on Smith. To establish a violation of the Equal Protection Clause, the court told the jury, the plaintiffs bore the burden of proving:

> . . . that Wilson purposefully treated plaintiffs less favorably than similarly-situated white businesses when Wilson denied plaintiffs an opportunity to apply for inclusion on the Town's towing list.
>
> Plaintiffs must prove . . . that they were able and ready to provide towing services for the Town and that they suffered an injury in fact . . . .

Question No. 4 on the special verdict form then asked jurors, "Did Wilson violate the plaintiffs' rights to equal protection under the Fourteenth Amendment . . . ?" The jury answered "no." On the claim for which burden-shifting was most clearly warranted, the district court failed to assign to the defendants the burden of proving that the same result would have occurred even had race not been a motivating factor.

For several reasons, however, this error does not change the outcome here. First, it was Smith who proposed the wording of the Equal Protection instruction in the first instance. The defendants wanted to eliminate it on the ground that it was redundant and prejudicial. After proposing the instruction, Smith did not later suggest to the district court that the wording was erroneous,

and "it is axiomatic that arguments not raised below are waived on appeal." *Marseilles Hydro Power, LLC v. Marseilles Land and Water Co.*, 518 F.3d 459, 470 (7th Cir. 2008) (internal quotation marks omitted). Nor did Smith highlight the language of the Equal Protection instruction in his appellate briefing. See FED. R. APP. P. 28(a)(9) ("The appellant's brief must contain . . . citations to the authorities and parts of the record on which the appellant relies."). Finally, we cannot accept Smith's invitation to regard this as "a plain error in the instructions that . . . affects [plaintiffs'] substantial rights." See FED. R. CIV. P. 51(d)(2). Given that the jury found that the defendants proved the same result would have obtained even if race had not been a "motivating factor," we think it quite unlikely that a proper Equal Protection instruction here would have made any difference. This is not enough to justify the uncommon use of the plain error doctrine in a civil case.

**IV**

We conclude by noting that no one should have to experience the kind of racial bigotry that Smith endured for years—an experience confirmed by the jury's verdict. We would have liked to believe that this kind of behavior faded into the darker recesses of our country's history many years ago. When the chief law-enforcement officer of a Wisconsin town regularly uses language like "fucking nigger" in casual conversation, however, it is obvious that there is still work to be done. As a result of our holding today, Anthony Smith will

end up paying statutory costs of $4,423.51 to John Wilson and the Town of Beloit, unless the defendants in the interests of a broader vision of justice choose to forgive that payment. We can only hope that the outcome of this case does not discourage future plaintiffs who seek to challenge official misconduct and vindicate the basic guarantees of our Constitution and laws.

We AFFIRM the judgment of the district court, and we join in that court's epitaph for the case: "Regardless of the outcome here, the jury's finding of a racial motive should elicit embarrassment—not a sense of vindication—on the part of defendants." Each party is to bear its own costs on appeal.