In the

# United States Court of Appeals
## For the Seventh Circuit

No. 12-3589

MARCUS MORGAN,

*Plaintiff-Appellant*,

*v.*

SVT, LLC and STRACK & VAN TIL
SUPER MARKET, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 C 0474 — **Geraldine Soat Brown**, *Magistrate Judge.*

ARGUED APRIL 10, 2013 — DECIDED AUGUST 1, 2013

Before POSNER, WOOD, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge*. Marcus Morgan, who is
African-American, claims that he was fired from his security
job at a grocery store operated by defendants SVT, LLC and
Strack & Van Til Super Market, Inc. (collectively, SVT) because
he dared to report the misconduct of one of the store's white
managers. He sued, alleging that he lost his job on account of

his race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, and 42 U.S.C. § 1981. The district court granted summary judgment to SVT on both claims. We affirm.

## I

### A

SVT hired Morgan to work as a "loss prevention officer" (that is, a security guard) at the Elston Avenue location of its chain of "Ultra Foods" grocery stores. Morgan had previously worked security for Cub Foods, a grocery store that occupied the Elston location before Ultra Foods, but he left that job to take a higher-paying security position at a nearby Home Depot. Morgan was still working a full-time shift at Home Depot when he took the job at Ultra Foods in June 2007. He was a hard worker: he testified that he typically worked eight hours a day at Home Depot, and then worked up to six more hours at Ultra Foods. At the time the events in this case took place, Morgan was working roughly 40 hours a week at Home Depot and between 20 and 30 hours a week at Ultra Foods.

Morgan's direct supervisor at Ultra Foods was Raymond Gutierrez, whom Morgan knew from previous security jobs. As a "loss prevention manager," Gutierrez was responsible for overseeing security at four SVT-owned grocery stores in the Chicago area. Because Morgan was the only security officer assigned exclusively to the Elston store, Gutierrez sometimes personally worked security at the store as well. Gutierrez's supervisor was John Mowery, SVT's Director of Loss Prevention.

Morgan's primary duty as a loss prevention officer was to detain shoplifters. When a customer takes an item, conceals it, and walks past the last point of purchase without paying for the item, the loss prevention officer should apprehend the customer, bring the customer to an enclosed area, and identify and document the item that was taken. The customer is then generally allowed to leave, depending on the value of the item. This procedure is known as a "theft stop." Although SVT does not have a formal policy requiring a specific number of theft stops, Morgan was aware—based on his prior experience as a security guard and guidance from SVT—that his performance would be measured in part by the number of theft stops he made. Upon hiring Morgan, Gutierrez emphasized that SVT enforced its theft-stop policy more stringently than Cub Foods had, and that maintaining a reasonable number of theft stops was important to the company. Gutierrez also informed Morgan that other loss prevention officers had been fired for insufficient theft stops.

For the first two months Morgan worked at Ultra Foods, his theft-stop numbers were good. He made six stops in July and five in August. In September, however, Morgan made only one stop, and he made no stops in the first week of October. Gutierrez—who preferred to have informal discussions with his loss prevention managers when there was a problem with their performance, rather than issuing written warnings—had three or four conversations with Morgan in which he warned him that he needed to get his numbers up. Morgan did not perceive these conversations as disciplinary warnings, but he acknowledges that they took place. Gutierrez also testified that he proposed that Morgan transfer to a store in Forest Park,

where it might be easier for him to make stops, but that
Morgan rejected this option because the store was too far
away. Morgan disputes this. In his telling, *he* suggested the
move to Gutierrez, but Gutierrez did not respond. For pur-
poses of summary judgment, we accept Morgan's version; the
important point is that it is undisputed that the two discussed
Morgan's poor record of theft stops before he lost his job.

On October 7, 2007, Morgan found himself chatting with
the Elston store's dairy manager, Frank Kajdawowski.
Kajdawowski, who is white, told Morgan that his wife was
taking him to see the musical "Jersey Boys." As they were
speaking, Kajdawowski picked up a copy of the Chicago
Tribune, removed the "Showcase" section (which featured an
article about Jersey Boys) from the paper, and placed it in his
pocket. Morgan knew that store policy prohibited shoplifting
by employees as well as customers, but he was hesitant to stop
Kajdawowski because he was a manager. SVT's security policy
provided for stopping a rank-and-file employee who at-
tempted to leave the store with unpurchased merchandise, but
there was no corresponding policy concerning managers.
Therefore, instead of apprehending Kajdawowski, Morgan
used the store's surveillance system to videotape Kajdawowski
walking around the store with the newspaper in his pocket and
eventually leaving the store without paying for the paper.
Morgan then reported the incident to Gutierrez and the Elston
store manager, Mike Gugliano. Gutierrez and Morgan re-
viewed the video of the incident the next day, and Morgan
wrote a statement describing what had occurred.

After reviewing the incident, Gutierrez concluded that
Morgan acted too leniently and instead ought to have appre-

hended Kajdawowski. His supervisor, Mowery, by contrast, thought Morgan handled the incident appropriately. Morgan was not disciplined or reprimanded in relation to his handling of the "Kajdawowski incident." Kajdawowski received a one-day suspension without pay.

Immediately after the Kajdawowski incident, Morgan began receiving formal written disciplinary warnings, known as "Employee Corrective Action Notices." On October 9, Gutierrez issued two Corrective Action Notices. One stated that Morgan's quality of work was low, citing his lack of theft stops in the previous five to six weeks. It further stated that SVT expected Morgan to make between two and three theft stops a week and warned that if Morgan's performance did not improve by the end of the month, he risked being fired. The second notice reported that Morgan had been 90 minutes late on October 8, 2007, and that he had failed to follow the proper protocol for notifying SVT that he was running late. Morgan believes that these disciplinary notices were punishment for reporting Kajdawowski. He asserts that SVT had overlooked issues with his tardiness and low number of theft stops in the past and argues that SVT's sudden interest in disciplining him arose only after it realized that he was "the type of African-American who would turn in a white supervisor." (Morgan had, in fact, received two Corrective Action Notices for tardiness prior to the Kajdawowski incident; the notices indicated that they were for the fourth and sixth occasions on which he was late. Both were ultimately waived.)

Sometime after issuing the October 9 Corrective Action Notices, Gutierrez decided to dismiss Morgan. According to Gutierrez, this decision was reached after comparing Morgan's

theft-stop numbers to those of other loss prevention officers and after noting that Morgan had not made any theft stops since receiving the warning on October 9. Mowery approved Gutierrez's decision. In Mowery's opinion, Morgan was exhausted from working 70-80 hours a week, and this prevented him from adequately performing his job.

Morgan was fired on October 24, 2007. The Corrective Action Notice accompanying this action stated that Morgan was being fired for "lack of Production/Theft Stops." Morgan was replaced with a man who was fired after only a month for lack of theft stops. The next person hired remains in the job.

## B

On August 12, 2008, Morgan filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), alleging race discrimination and retaliation for reporting Kajdawowski's shoplifting. The EEOC issued a right-to-sue letter on October 23, 2009. Morgan then filed this lawsuit in the district court, alleging race discrimination theories under both Title VII, 42 U.S.C. §§ 2000e, *et seq.*, and 42 U.S.C. § 1981. He did not renew his claim for retaliation. The parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c) and Northern District of Illinois Local Rule 73.1.

SVT moved for summary judgment. The court granted the motion after concluding that Morgan had put nothing in the record that could support a finding of racial discrimination. It emphasized that Morgan had not identified any other SVT employee outside his protected class who was treated more favorably under similar circumstances, nor had he presented evidence that SVT had a pattern of treating workers within his

protected class unfavorably. Indeed, Morgan acknowledged that up until his termination, he never felt that Gutierrez treated him or any other employee differently on account of his race. Neither did the circumstances surrounding Morgan's firing, in themselves, raise a plausible inference of race discrimination. Although Morgan argued that the timing of his firing (so soon after the Kajdawowski incident) was "suspicious," given Morgan's documented failure to perform theft stops, Gutierrez's prior warnings about the lack of theft stops, and SVT's stringent enforcement of its anti-shoplifting policies, the court concluded that suspicious timing alone was insufficient to create a genuine dispute over whether Morgan was fired for failing to meet SVT's legitimate job expectations or for insidious racial reasons. This appeal followed.

## II

### A

Title VII prohibits employers from discriminating based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Section 1981 focuses on the right to be free of racial discrimination in the making and enforcing of contracts. As we have noted before, "the methods of proof and elements of [a Section 1981] case are essentially identical" to those in a Title VII case. *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009); see also *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 649 (7th Cir. 2011). We thus do not separately discuss Morgan's Section 1981 theory. In order to succeed in a Title VII lawsuit, a plaintiff must show that he is a member of a class protected by the statute, that he has been the subject of some form of adverse employment action (or that he has been subjected to a

hostile work environment), and that the employer took this adverse action on account of the plaintiff's membership in the protected class. See *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring). Stated this way, we can see that the elements of a Title VII claim are straightforward. Demonstrating that a plaintiff has enough evidence to survive summary judgment, however, has become a complex exercise. *Id.*; see also *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 737 (7th Cir. 2013) (citing spate of recent cases from this court expressing frustration with the "ossified direct/indirect paradigm").

When a plaintiff is responding to an employer's motion for summary judgment, he (in this case) must initially identify whether he is litigating his case under a "direct" or an "indirect" method of proof (or both). The real distinction between these two methods, however, is not whether one relies solely on "direct" evidence (in the sense of a smoking gun) and the other relies on circumstantial evidence. The labels have become terms of art.

"Direct" proof includes both evidence explicitly linking an adverse employment action to an employer's discriminatory animus, see, *e.g.*, *Smith v. Wilson*, 705 F.3d 674, 677 (7th Cir. 2013); *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011), and circumstantial evidence that would permit the trier of fact to infer that discrimination motivated the adverse action, see *Diaz*, 653 F.3d at 587. In order to illustrate the idea that the circumstantial evidence, taken as a whole, must permit that inference, we have used the metaphor of a mosaic whose individual tiles add up to a complete picture. See *Coleman*, 667 F.3d at 863 (Wood, J., concurring); *Wright v. Southland Corp.*,

187 F.3d 1287, 1290-92 (11th Cir. 1999); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). Contrary to what many have thought, this does not mean that there is some kind of esoteric "mosaic test" or theory. All these cases mean is that the circumstantial evidence must be strong enough, taken as a whole, to allow the trier of fact to draw the necessary inference. Typical kinds of evidence used for this purpose include "(1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action." *Diaz*, 653 F.3d at 587. If the plaintiff can assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for the defendant is not appropriate, and the plaintiff may prevail at trial even without producing any "direct" proof.

The term "indirect method" refers to a particular way of using circumstantial evidence at the summary judgment stage. It was pioneered by the Supreme Court 40 years ago in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). It employs a burden-shifting approach under which the plaintiff must initially show that: "(1) []he is a member of a protected class, (2) he met h[is] employer's legitimate job expectations, (3) []he suffered an adverse employment action, and (4) similarly situated employees outside of the protected class received more favorable treatment." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). If the plaintiff has evidence that can

meet those four criteria, the burden shifts to the employer to offer a non-discriminatory reason for the adverse employment action. *Id.* If the employer does so, the burden shifts back to the plaintiff to present evidence that, if believed by the trier of fact, would show that the real explanation for the action is discrimination. *Id.*

At times, litigants and courts alike can get lost in the technical nuances of the "direct" and "indirect" methods. As this case illustrates, an overly rigid distinction between the two can cause a plaintiff who presents evidence that bears on both the "direct method-circumstantial branch" and the "indirect method"—such as evidence of an employer's preferential treatment of similarly situated employees outside of the plaintiff's protected class—to risk forfeiting an argument under either method if he fails to specify which method he is using. Morgan did not inform the court of the approach he was taking, and so after examining the nature of his evidence, the district court assumed that Morgan had waived use of the "direct" method. Much of Morgan's evidence, however, is relevant under either method; the "suspicious timing" of Morgan's termination, for instance, could provide circumstantial evidence linking the termination to discrimination under the "direct" method, while it could also go to pretext under the "indirect" method. And as it happens, Morgan's case is marginally stronger under the "direct" method, which can be more flexible than the "indirect" method because it does not contain so many pre-set elements. Morgan's failure to provide any evidence on step 4 of the "indirect" approach (*i.e.*, that similarly situated employees outside his protected group were treated better than he) means that his case is all but doomed

under the "indirect" method. This could mean that Morgan lost a (marginally) more promising argument by being insufficiently attentive to the demands of these two approaches. If so, he would not be the first employment discrimination plaintiff to have been ensnared in this trap. See, *e.g.*, *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 750 n.3 (7th Cir. 2006).

The "direct" method, and in particular the metaphor of the mosaic, has also bred confusion. When that idea was first introduced in *Troupe*, it captured the commonsense notion that individual pieces of circumstantial evidence that do not, in and of themselves, conclusively point to discrimination might nevertheless be sufficient to allow a trier of fact to find discrimination when combined. 20 F.3d at 737; see also *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006). Over the years, however, the phrase has taken on a life of its own. See, *e.g.*, *East-Miller v. Lake Cnty. Highway Dep't*, 421 F.3d 558, 564 (7th Cir. 2005); *Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 794 (7th Cir. 2005). This is unfortunate. Standing alone, the phrase misleadingly suggests that circumstantial evidence must combine to form a tidy, coherent picture of discrimination, in the same way the tiles of a mosaic come together to form a tidy, coherent image, in order for a plaintiff to survive summary judgment. This is not the standard. As we said in *Sylvester*, 453 F.3d at 904, "it was not the intention in *Troupe* to promulgate a new standard, whereby circumstantial evidence in a discrimination or retaliation case must, if it is to preclude summary judgment for the defendant, have a mosaic-like character." The plaintiff's task in opposing a motion for summary judgment is straightforward: he must produce enough evidence, whether direct or circumstantial, to permit

the trier of fact to find that his employer took an adverse action against him because of his race. The structured inquiry introduced by *McDonnell Douglas* and the reference to a "mosaic" of circumstantial evidence in *Troupe* were supposed to facilitate that task, not to require plaintiffs to use only those kinds of evidence or, in *Troupe,* to do more than characterize the facts in that case.

We make these observations in an effort to bring some needed flexibility and common sense back to the critical task of deciding when summary judgment is appropriate in an employment discrimination case. The central question at issue is whether the employer acted on account of the plaintiff's race (or sex, disability, age, etc.). If a plaintiff has carefully followed the burden-shifting approach of *McDonnell Douglas*, well and good: the district court should have no trouble assessing the summary judgment motion. Similarly, if a plaintiff eschews burden-shifting and presents direct and circumstantial evidence in opposition to an employer's motion for summary judgment, the court can look at that. The latter, it seems to us, should be the default rule. This takes us back to the original purpose of *McDonnell Douglas*, which was to outline a series of steps that, if satisfied, would support a plaintiff's right to reach the trier of fact. By using the "direct" approach as the default rule, we prevent no one from using the "indirect" approach, but we can remove some of the rigidity from the system that has developed over the years.

B

Morgan, as we said, did not make clear to the district court which method of proof he was using. Our review from a grant

of summary judgment, however, is *de novo*. See *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1104 (7th Cir. 2012). The district court assumed that Morgan was relying on the "indirect" method, but we are willing to look at his proof from both perspectives. Unfortunately, that does him little good: no matter how we label his evidence, it is not enough to create a triable issue of fact on the question whether he lost his job because of racial discrimination. In order to survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), but metaphysical doubt is all that we can muster here. Morgan has not identified a single SVT employee who was treated differently under comparable circumstances. He points to Kajdawowski and argues that his one-day suspension for taking a section of a newspaper shows that white employees received greater leniency, but Morgan and Kajdawowski were not at all similar to one another. Not only was Kajdawowski a manager subject to a different chain of supervision than Morgan, but Kajdawowski's infraction was trivial. By contrast, in failing to make theft stops, Morgan was failing to perform one of his core job duties. No jury could reasonably infer that SVT had no rational basis for responding differently to Kajdawowski's "shoplifting" from the way it did to Morgan's failure to make theft stops.

Morgan also suggests that he could not point to any similarly situated but differentially treated SVT employees outside his protected class, because he and Gutierrez were the only security officers who worked at the Elston store. (There is some dispute on this point, because the record suggests that a

person named Gregory Presley, who is also African-American, occasionally worked at the Elston store as well. Morgan appears to deny this, however, and for purposes of summary judgment, we view the evidence in the light most favorable to Morgan. *Brown*, 700 F.3d at 1104.) But there were numerous security officers working at SVT's other stores in the Chicago area, and any of these employees could have served as a plausible comparator to Morgan.

Morgan leans heavily on the "suspicious timing" of his termination, pointing out that he began receiving disciplinary notices two days after reporting Kajdawowski and was fired several weeks later. But Morgan does not argue that the notices were baseless. Morgan had not made any theft stops in the first week of October, he made only one in September, and he failed to make any additional stops in the weeks between receiving the Corrective Action Notice on October 9 and his firing on October 24. While suspicious timing is relevant evidence that can raise a genuine issue of fact about discrimination, see, *e.g.*, *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011); *McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 797 (7th Cir. 1997), suspicious timing alone is rarely enough to survive summary judgment, see, *e.g.*, *Lewis v. City of Chi.*, 496 F.3d 645, 655-56 (7th Cir. 2007). Where, as here, there are reasonable, non-suspicious explanations for the timing of Morgan's termination—namely, that he was still not making theft stops—we will not deny summary judgment solely on the strength of this one point.

Moreover, even if SVT *did* fire Morgan because of the Kajdawowski incident, it does not follow that the termination

was based on race. There is no indication in the record that either Gutierrez or Mowery was unhappy with Morgan's handling of the incident because the subject of his report was a white man. Indeed, the only indication that either of them was unhappy about the incident comes from Gutierrez's comment that he thought Morgan should have acted more aggressively by stopping Kajdawowski before he left the store—a comment that is flatly inconsistent with the inference that Gutierrez was upset that Morgan was not deferring to his white superiors. Hypothetically, one could imagine a discrimination claim based on an African-American employee's being punished for pointing out the misconduct of a white supervisor if African-American employees were fired for reporting white managers, but white employees were not, or if the employee's supervisors expressed extreme and irrational displeasure at the employee's decision to report a white superior. Under the facts before us, however, it is far more likely that Gutierrez and Mowery were at most annoyed over the fuss caused by such a minor incident. That would be a different reason for firing Morgan than the one stated, but it would not be impermissible, because it is not based on race or any other prohibited ground.

Morgan's final argument is that SVT's Human Resources Director, Jessica Hon, gave somewhat different explanations for Morgan's firing in a position statement to the EEOC and in this case. In response to Morgan's EEOC charge, Hon stated that Morgan could have avoided firing if he had stopped Kajdawowski, as opposed to just recording and reporting the incident. In her deposition, however, Hon stated that after speaking with Gutierrez and Mowery, she realized that Morgan would have needed more than a single theft stop in

October in order to avoid losing his job. We need not resolve this inconsistency. Hon was not involved in the decision to fire Morgan. The undisputed evidence is that loss prevention managers make hiring and firing recommendations subject to Mowery's approval, without input from Human Resources. A single, minor discrepancy in the statements of someone so peripherally involved in the contested action is too tenuous a ground on which to send this case to a jury. The discrepancy may undermine Hon's credibility, but a party cannot defeat summary judgment with resort to attacks on credibility alone. See *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). Under any view of the evidence, Morgan has failed to raise a genuine dispute of fact on the question whether he was the victim of discrimination.

We therefore AFFIRM the judgment of the district court.