In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-3311

DIANA EVERROAD,

*Plaintiff-Appellant,*

*v.*

SCOTT TRUCK SYSTEMS, INC. and
SHERRY HANTZIS, in her individual
capacity,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:06-CV-00770-RLY-JMS—**Richard L. Young,** *Chief Judge.*

ARGUED SEPTEMBER 22, 2009—DECIDED MAY 10, 2010

Before EASTERBROOK, *Chief Judge*, and BAUER and
ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge.* Diana Everroad sued her
former employer, Scott Truck Systems, Inc. ("Scott
Truck"), and Sherry Hantzis, the company's general
manager, for gender and age discrimination, and for
retaliation for reporting gender and age discrimination.
The district court granted summary judgment in favor
of the defendants, and Everroad appeals. We affirm.

## I.

Scott Truck is a family-owned commercial trucking business. David Scott ("Scott") is the owner and president of the company, and his wife, Sherry Hantzis ("Hantzis"), is the general manager. In the spring of 2004, Everroad, who was fifty-one years old at the time, applied for a job as a dispatcher at Scott Truck. On Hantzis' recommendation, Scott hired Everroad, selecting her over three other candidates. The other applicants included Tim Wilson, age forty; Dennis Wilder, age fifty; and Tina Skadra, age twenty-four. The dispatcher job entailed pairing customer loads with trucks and drivers, ensuring that drivers turned in their required paperwork, and helping the drivers. The dispatcher had extensive contact with both drivers and customers.

Jim Moore was Everroad's direct supervisor. Although he was responsible for training Everroad, he failed to do so over a two-month period, and Scott was forced to train her while Moore was on vacation for two weeks. Moore complained that Everroad did not understand her job, and two of Scott Truck's largest customers also complained about their encounters with Everroad. Everroad also experienced conflicts with other Scott Truck employees. Tim Wilson, who had been passed over for the dispatcher job, told Everroad that she was not a good dispatcher and should not have been hired. Wilson also told Everroad that he was unhappy that more women were being hired at the company, and that the male employees preferred the company when it was all men. Wilson repeated that he did not think Everroad

should be working at the company within the hearing of Moore, who simply told Everroad to "let it go." Everroad points to no evidence that Moore, Scott or Hantzis were aware that Wilson had expressed any gender-based comments to Everroad. Scott and Hantzis, in fact, heard raised voices and asked Wilson and Everroad what had happened. Everroad told them that Wilson said she could not do her job and he did not want her to perform the dispatch job. Scott and Hantzis told Wilson that he was required to work with Everroad as long as she was the dispatcher. During this meeting, Wilson asked several times if he could leave, and Hantzis insisted that he stay until the meeting was concluded.

Everroad had four run-ins with John Mulligan, a driver for Scott Truck. The first two encounters were on the telephone, and on each occasion, Mulligan yelled at Everroad and insisted that he talk to either Moore or Scott, declining to talk to Everroad about dispatch matters. After those first two calls, Everroad left Mulligan a voice mail asking to speak with him about his manner on the phone and telling him she would not allow him to scream at her again. The next time Mulligan came into the office, he pounded on the office door, which Everroad had locked because she was alone in the office. When she unlocked the office door, he slammed the door open in a manner she found physically intimidating. Everroad secretly recorded her fourth confrontation with Mulligan. At that time, he made a derogatory remark to Everroad that was gender-based, attributing her demeanor to "PMS," presumably meaning premenstrual syndrome. Everroad told Scott and

Hantzis about this remark, but Everroad did not know whether they did anything about it. Mulligan's brusque manner extended to his employer as well. Everroad's husband, who was a truck driver for Scott Truck, saw Mulligan "verbally screaming at Dave Scott in a loud and humiliating manner while employed at STS." R. 72, Ex. C. Hantzis acknowledged that Mulligan was a large man with a booming voice and a sarcastic wit, who liked to "tease" people. Hantzis also conceded that Mulligan sometimes did not control his anger well. But Hantzis and Scott both denied that Mulligan, whom they considered a friend, ever was insubordinate with them.

In August 2004, Scott and Hantzis moved Everroad from the dispatcher position to a newly created "data administrator" job. Everroad's new duties included filing, tracking information for payroll purposes, performing data entry, and screening the public. Everroad received the same pay and worked the same number of hours as in the dispatch job. Hantzis told Everroad that she could pick her own start time as long as she worked a full day, and so the job was more flexible than the dispatcher position. As data administrator, Everroad shared an office with Jennifer Sasser. Sasser, a twenty-eight year old hourly-wage employee, was responsible for copying audiobooks onto compact disks for the company's drivers to use on long trips. The shared office had only one telephone and it was placed on Sasser's desk. Sasser had health and family issues and made personal calls at work to address some of these problems. Everroad found the calls distracting and disturbing, and eventually complained to Hantzis about this issue.

Hantzis counseled Sasser to use a lobby phone or her cell phone for extended calls, but Sasser fell back into her old pattern after a few days of compliance with Hantzis' request.

Everroad found it especially difficult to listen to Sasser's health-related calls after the long-time boy-friend of Everroad's sister suffered a heart attack. When she again complained to Scott and Hantzis about Sasser's excessive telephone use and the disturbing content of the calls, Hantzis suggested that Everroad take time off from work to address issues in her personal life. Everroad took offense at this suggestion and later compiled a written list of complaints about Sasser. She presented this list to Hantzis and Scott, who then called a meeting with Everroad and Sasser to resolve the con-flict. The meeting did not go well. Everroad sur-reptitiously recorded the first hour and a half of the meeting. Both Everroad and Sasser denied there was a conflict. Sasser was asked to leave the meeting at some point and then rejoined it much later. By all accounts it was a lengthy and tense meeting. Voices were raised, accusations were exchanged, tears were shed, and eyes were rolled. By the end of the meeting, the group com-piled proposals that might allow Everroad and Sasser to work peacefully in the same office. Plans were made to reconvene the next day to discuss the proposals. Hantzis and Scott, however, were disturbed by Everroad's conduct during the meeting and discussed that evening whether she had been insubordinate. They concluded she had been and began considering their options. The next morning, when they arrived at work, Everroad

ignored Hantzis' morning greeting, but acknowledged Scott's greeting in an exaggerated manner. Irritated that Everroad had pointedly ignored Hantzis, and given the previous days' events, they decided to terminate her for insubordination. After consulting their attorney, Scott gave Everroad a termination letter and her final paycheck at the end of the workday, and waited while she gathered her belongings to leave. Everroad asked Scott why she was being fired and he replied, "You winked at Sherry." Everroad took the opportunity to tell Scott that Hantzis had been saying unflattering things about him behind his back. By her own account, she also told Scott that he and his wife were "nuts, crazy, insane" and "sick." Hantzis appeared a short while later and told Everroad that they cared about her. Everroad, by her own account, replied by telling Hantzis to "fuck herself" and also called her a "fucking bitch." That evening, Everroad called Scott and asked for severance pay. Scott declined.

Everroad sued Scott Truck and Hantzis under federal and state law. She contended that Scott Truck violated Title VII by treating similarly situated male employees more favorably and by retaliating against her when she voiced opposition to this practice. She also alleged that Scott Truck violated the Age Discrimination in Employment Act ("ADEA") by treating younger employees more favorably and by retaliating against her when she objected to this practice. Everroad brought state law claims against Scott Truck for wrongful termination and negligent retention, and against Hantzis for assault and intentional infliction of emotional distress. The district

court granted summary judgment in favor of the defendants on Everroad's federal claims and declined to exercise supplemental jurisdiction over the remaining state law claims. Everroad appeals.

## II.

On appeal, Everroad complains that the district court improperly refused to consider certified transcripts of the two secretly recorded conversations. She also asserts that the court erred in finding that she was not similarly situated to Tim Wilson and John Mulligan for the purposes of her Title VII claims. She maintains that the court erred again when it found Everroad was not similarly situated to Jennifer Sasser for the purpose of her ADEA claims. She contends that she adequately established that the non-discriminatory reason given by Scott Truck for her termination was pretextual, and that she also provided sufficient evidence to establish a causal link between her protected activity and adverse employment actions for the purpose of her retaliation claims. Our review of the evidentiary decision is for abuse of discretion and we review the court's decision to grant summary judgment *de novo*. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009); *George v. Walker*, 535 F.3d 535, 538 (7th Cir. 2008).

## A.

In the district court and on appeal, Everroad offered transcripts of the conversations she recorded with John

Mulligan and with Scott and Hantzis. The transcripts purport to be prepared by a "transcriptionist" and are accompanied by statements attesting to the accuracy of the transcription and the absence of any financial interest in the outcome of the litigation by the preparer.[1] In the district court, in her response in opposition to the defendants' motion for summary judgment, Everroad quoted these transcripts and dropped footnotes stating, "Plaintiff's counsel can make the actual recording available for the Court's review." R. 72, at 5-6. In her opening brief on appeal, she makes a similar offer. For each transcript that she cites, she states, "Appellant's counsel can make the actual recording available for this Court's review." Brief of Appellant, at 11 and 14. Yet there is no "actual recording" in the certified record on appeal and counsel appears to have never provided the tapes to the district court either. Instead, Everroad faults the district court for failing to ask to review the tapes after she extended her offer.

The district court declined to consider the transcripts as evidence in assessing the defendants' motion for summary judgment. The court found that a tape recording rather than a transcript of a conversation consti-

---

[1] The defendants point out that the certifications signed by the transcriptionist and included in Everroad's appendix on appeal were not part of the record before the district court. We generally will not consider evidence that was not presented to the district court. *Hernandez v. HCH Miller Park Joint Venture*, 418 F.3d 732, 736 (7th Cir. 2005). We cite the information from the certifications only to provide background.

tutes evidence of what was said. *See Stringel v. Methodist Hosp. of Indiana, Inc.*, 89 F.3d 415, 420 (7th Cir. 1996). *See also United States v. Howard*, 80 F.3d 1194, 1198 (7th Cir. 1996) (the real evidence of who said what in a recorded conversation is the tape itself rather than a transcript of the tape). The court also found that the relevancy and accuracy of the tapes and the transcripts were questionable because both recordings are largely inaudible and because Everroad did not know whether the recordings were complete recordings of the entire conversations. *Stringel*, 89 F.3d at 420 (a district court is obliged to ascertain that a recording is sufficiently audible to constitute reliable evidence of the conversation recorded). Indeed, as Everroad now concedes, the tape recording of the meeting with Scott and Hantzis covers only the first hour and a half of a meeting that she claims went on for six and half hours.

Everroad nonetheless argues that the court erred in concluding that the tapes were largely inaudible without actually listening to the tapes. There are two problems with this argument. First, Everroad did not submit the tapes to the district court. She offered to submit the tapes but she never actually submitted them. It is not the district court's responsibility to seek out relevant information that a party has in its possession. She had an opportunity to present the tapes and she did not. It is a strange and unwise strategy for a party to advise a court that it has relevant evidence without actually submitting the evidence. Summary judgment proceedings provide the "put up or shut up" moment in litigation. Offering to provide the tapes is not the same as providing

them, and the court was under no obligation to review anything that was not part of the record. Even on appeal Everroad makes this offer to provide the tapes to this court if we wish to hear them. But we generally will not consider evidence that was not before the district court, and there is no doubt that the tapes were never provided to the district court. *Hernandez v. HCH Miller Park Joint Venture*, 418 F.3d 732, 736 (7th Cir. 2005) (this court may consider only evidence properly presented to the district court). Everroad has never provided the tapes to any court.

Second, the transcripts themselves prove the court's conclusion that the tapes are largely inaudible. The transcriptionist hired by Everroad found significant portions of the tapes inaudible. For example, the transcript of the taped conversation between John Mulligan and Diane Everroad begins:

(Voices far away—inaudible)

JOHN:   (inaudible)

DIANE:  (inaudible)

JOHN:   (inaudible) I didn't say you didn't (inaudible)

DIANE:  (inaudible)

JOHN:   (inaudible) any time you see me go (inaudible)

DIANE:  (inaudible) you always act like your [sic] mad.

JOHN:   You know what, that is your perception.

DIANE: I don't . . .

JOHN:   That is your perception and that is not my problem. (inaudible) perception (inaudible) stuffed animals, this is Dave's stuff. I would like to (inaudible)

DIANE: (inaudible)

JOHN:   (inaudible)

R. 72, Ex. E. And so it goes. At times, it is more comprehensible but it is impossible to follow the thread of the conversation at all. The transcript of the first hour and a half of the meeting with Scott and Hantzis is somewhat better but the first page includes the "inaudible" indicator nine times. R. 72, Ex. D. That conversation also includes numerous indications of "talking over," presumably where two people were speaking at the same time. There is no indication in the transcript regarding the length of the inaudible portions of the transcript. It could be a word, a phrase, a sentence or a page. We have no way of knowing. And the district court had no way of knowing, either, how much was missing. The conversation between Everroad and Mulligan is essentially incomprehensible. The conversation with Scott and Hantzis is partly incomprehensible and contains numerous omissions of unknown length, together with an admission that the last five hours of the meeting are missing. Given the circumstances, any argument that the district court abused its discretion in refusing to consider the transcripts is frivolous.

**B.**

We turn to Everroad's claims for age and gender discrimination, and for retaliation. For each of the discrimination claims, Everroard lacks direct evidence of discrimination and relies on the *McDonnell Douglas* burden-shifting analysis to make her case. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Lucas v. PyraMax Bank, FSB*, 539 F.3d 661, 666 (7th Cir. 2008). To make out a *prima facie* claim under *McDonnell Douglas*, a plaintiff must demonstrate that (1) she is a member of a protected class, (2) she met her employer's legitimate job expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees outside of the protected class received more favorable treatment. *Lucas*, 539 F.3d at 666. If the plaintiff is able to establish a *prima facie* case of discrimination, the burden then shifts to the employer to offer a non-discriminatory reason for the adverse employment action. If the employer does so, the burden shifts back to the plaintiff to submit evidence demonstrating that the employer's explanation is a pretext. *Gates v. Caterpillar, Inc.* 513 F.3d 680, 690 (7th Cir. 2008).

For each claim, the parties agree that Everroad can establish that she is a member of a protected class because she is female and over forty years of age, and that she suffered an adverse employment action when she was terminated. They disagree on the state of the record for the other two parts of the analysis. Everroad argues that the evidence is undisputed that she was meeting her employer's legitimate job expectations and

that similarly situated male and younger employers were treated more favorably. Scott Truck, of course, contends that Everroad was not meeting the company's legitimate expectations because she was insubordinate. The company also contends that Everroad has failed to identify any male employees or younger employees who were similarly situated because no one else had engaged in insubordination.

Normally, we first determine whether a plaintiff has established a *prima facie* case before putting the employer to the burden of demonstrating a non-discriminatory reason for a termination and engaging in the pretext analysis. *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 823 (7th Cir. 2006). In some cases, though, the issue of satisfactory performance and the question of pretext overlap. When the employer asserts as the non-discriminatory reason for termination that the employee was not meeting legitimate job expectations, the credibility of the employer's assertion is at issue for both the second element of the plaintiff's *prima facie* case and the pretext analysis. *Hague*, 436 F.3d at 823. *See also Bodenstab v. County of Cook*, 569 F.3d 651, 657 (7th Cir. 2009) (although the question of pretext arises only after the plaintiff has established a *prima facie* case of discrimination and the employer has countered with a legitimate non-discriminatory reason for the adverse action, we may skip over the initial burden-shifting of the indirect method and focus on the question of pretext); *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 665 (7th Cir. 2007) (the *prima facie* case and pretext inquiry often overlap; we may skip the analysis of the *prima facie* case

and proceed directly to the evaluation of pretext if the defendant offers a non-discriminatory explanation for its employment decision). There is a good deal of overlap in this case between these key issues. Everroad was not meeting her employer's legitimate expectations if she was insubordinate; insubordination is a non-discriminatory reason for termination; and Everroad is similarly situated only to other insubordinate employees. Everroad essentially concedes in her brief that Scott and Hantzis genuinely believed she had been insubordinate at the lengthy meeting the day before her termination, and also that she had been insubordinate the next morning, immediately before Scott and Hantzis decided to terminate her.[2] Appellant's Brief at 15 ("Scott and Hantzis determined that Appellant was insubordinate during the 6½-hour meeting and discussed their options in dealing with Appellant. . . . As they walked away, Scott and Hantzis agreed that Appellant pointedly

_____

[2] Everroad argues that a reasonable jury could conclude that her conduct at the meeting did not constitute insubordination. But that is not the relevant inquiry. The decisive question is whether Scott and Hantzis genuinely believed that Everroad had been insubordinate, and even Everroad concedes that they did. That a jury might disagree with them or even find that they erred in their assessment does not render their termination decision discriminatory. So long as they genuinely believed in the truth of their stated reason for the decision, that reason is not pretextual. *See Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006) (an employer's mistaken belief that the plaintiff's conduct merited termination is not unlawful, so long as the belief was honestly held).

ignored Hantzis and, at that moment, they decided to terminate her for insubordination."). She does not contest that she engaged in any of the behavior that led Hantzis and Scott to conclude that she was insubordinate. Among other things, during the lengthy meeting to discuss the problem with Sasser, Everroad rolled her eyes at Hantzis, and when Hantzis asked her not to, she replied, "I'm allowed to have facial expressions." She threw up her arms and yelled, "Jeez!" in response to something Hantzis said. When Hantzis tried to confirm something Everroad said earlier in the meeting, Everroad said, "I don't need your confirmation." She also told Hantzis, "It doesn't matter what I say. You're going to put a spin on it." She also compared Sasser's phone calls about her father's health problems to a scene in the movie *Forrest Gump*, where the character Bubba rambles on about the different ways to cook shrimp. Finally, she refused to say hello to Hantzis the following morning. All of this Scott and Hantzis found to be inappropriate and insubordinate workplace behavior.

Everroad denies that this explanation accounts for her termination, however, because she contends that Mulligan, Wilson and Sasser also were insubordinate but they faced no adverse employment action. In other words, Everroad argues that because these similarly situated employees were not terminated, the reason given for her termination is a pretext. To demonstrate pretext, Everroad must show that her employer did not honestly believe in the reasons it gave for terminating her. *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 876

(7th Cir. 2002). "Pretext means a dishonest explanation, a lie rather than an oddity or an error." *Bodenstab*, 569 F.3d at 657. *See also Filar v. Board of Educ. of Chicago*, 526 F.3d 1054, 1063 (7th Cir. 2008) (demonstrating pretext requires proof that the defendant's explanation is unworthy of credence). When a plaintiff claims to have been disciplined more harshly than other, similarly situated employees based on a prohibited reason, the plaintiff typically must demonstrate that the other employees "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Antonetti v. Abbott Labs.*, 563 F.3d 587, 592 (7th Cir. 2009).

Everroad's evidence that these other three employees enagaged in similar conduct is thin to nonexistent. For Wilson, Everroad claims only that he asked whether he could leave a meeting before it was finished. She concedes that Wilson complied when he was told he could not leave. Sasser continued to make personal calls related to family health matters in the office she shared with Everroad after Hantzis and Scott asked her not to do so. As a result of the ongoing conflict between Sasser and Everroad, Scott and Hantzis called Sasser into the same conflict-resolution meeting where Everroad engaged in most of the conduct that led to her dismissal. There is no evidence that Sasser behaved in an insubordinate manner at that meeting. Sasser's occasional noncompliance with the new phone rule appears to have irritated only Everroad; Scott and Hantzis did not consider Sasser's conduct to be insubordinate toward them. As

for Mulligan, Everroad's husband averred that he witnessed Mulligan "verbally screaming at Dave Scott in a loud and humiliating manner." R. 72, Ex. C. Mulligan, a friend of Scott and Hantzis, was known at Scott Truck for his booming voice and sarcastic wit. The only evidence in the record defining insubordination at Scott Truck was Hantzis' testimony that she told Mulligan it would be a major issue if he was inordinately rude or if he refused to do something she asked him to do. There is no evidence in the record that Scott or Hantzis believed that Mulligan or any employee other than Everroad had violated this standard.[3] Although

---

[3] The district court also found that Mulligan and Wilson were not similarly situated because there was no evidence they were treated more favorably than Everroad *at the time* of her termination. In each case, any possibly insubordinate acts by Mulligan and Wilson had occurred approximately a year earlier. The district court cited *Keri v. Board of Trs. of Purdue Univ.*, 458 F.3d 620, 644 (7th Cir. 2006) for the proposition that "the Plaintiff must establish that the similarly situated employees were treated more favorably *at the time* of the alleged discrimination" against the plaintiff. D. Ct. Opinion at 17, quoting *Keri*, 458 F.3d at 644 (emphasis added by the district court). This *dictum* in *Keri* cites to *Jordan v. City of Gary, Indiana*, 396 F.3d 825, 834 (7th Cir. 2005). *Jordan*, in turn, relies on *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003). Both *Jordan* and *Grayson* were failure-to-promote cases, and part of the *prima facie* case required the plaintiff to demonstrate that the employer granted the promotion to someone outside the protected group who was not better qualified than

(continued...)

Everroad's husband perceived Mulligan's speech as "humiliating," there is no evidence in the record that Scott or Hantzis ever found that Mulligan was "inordinately rude" or that he refused to do something after being asked to comply.[4] Without any evidence that these

---

[3] (...continued)
the plaintiff. In the context of a failure-to-promote case, when the comparator is the person who was promoted instead of the plaintiff, the "same time" analysis is important to the consideration of whether the comparator is similarly situated to the plaintiff. *Keri* was not a failure-to-promote case but rather involved a decision not to reappoint the plaintiff for another term. The comparators were not similarly situated because some were tenured employees to whom different standards applied, some reported to different supervisors, and for some the plaintiff was simply too vague about when and how the other employees were treated in a more favorable manner. The timing issue was not determinative. Because the instant case does not involve a failure to promote, the analogy to these cases is not particularly apt.

[4] Jim Everroad, the plaintiff's husband, averred that he "personally witnessed John Mulligan verbally screaming at Dave Scott in a loud and humiliating manner while employed at STS. Mulligan's speech included a substantial amount of profanity." The characterization of Mulligan's speech as "humiliating" is conclusory and unsupported by any specific information in the affidavit. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (conclusory allegations unsupported by specific facts will not suffice to defeat summary judgment). Jim Everroad had no personal knowledge of how Scott per-

(continued...)

other employees met Hantzis' definition of insubordination, Everroad's case fails on two levels. First, she has failed to demonstrate that she was performing up to her employer's legitimate job expectations and has also failed to identify any other employees at Scott Truck who were similarly situated to her. She is thus unable to make out a *prima facie* case of discrimination under the *McDonnell Douglas* analysis. Second, she has failed to present any evidence calling into question the sincerity of her employer's non-discriminatory reason for terminating her, namely, that she was insubordinate. The district court therefore correctly granted summary judgment in favor of the defendants on Everroad's claims for age and gender discrimination.

Her claims for retaliation also fall short. On appeal, Everroad makes no argument at all that Scott Truck retaliated against her for complaining about age-related discrimination. Instead she argues that she was removed from her position as dispatcher because of her complaint about Wilson's sexually derogatory comments, and that she was terminated for complaining about Mulligan's PMS comment. Her argument regarding her com-

---

[4] (...continued)

ceived this incident. At most, it appears that Jim Everroad concluded that Mulligan's speech was humiliating because it was generously laced with profanity. The definition of insubordination employed by Hantzis did not disallow profane speech. Profanity was apparently part of the environment at Scott Truck, as evidenced by Everroad's parting words to her employer.

plaint about Wilson fails for three reasons. First, her appeal is the first time that she claims that her transfer from dispatch was an adverse employment action, and she has thus waived that claim. *Pole v. Randolph*, 570 F.3d 922, 937 (7th Cir.), *cert. denied*, 130 S.Ct. 562 (2009) (a party may not raise an issue for the first time on appeal). Second, the move to the data administrator position was a lateral move with no loss of pay, benefits, or significant changes to working conditions. A purely lateral move to a new position, a transfer that "does not involve a demotion in form or substance," cannot serve as an adverse employment action. *Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008). Neither does a transfer involving no reduction in pay and no more than a minor change in working conditions qualify as an adverse employment action. *Maclin*, 520 F.3d at 788. Finally, there is no evidence that Everroad reported Wilson's gender-based comments to anyone at Scott Truck. Although Moore overheard Wilson telling Everroad she should not be working for the company, there is no evidence that he overheard Wilson's gender-based comments, and Everroad did not report Wilson's comments to Scott or Hantzis.

Turning to her retaliation claim regarding Mulligan's PMS comment, Everroad argues that the district court considered only the temporal relationship between her report of the PMS comment and her termination. Because there was a year-long gap between Everroad telling Scott and Hantzis that Mulligan made this remark and Everroad's termination, the district court found that timing would not help Everroad establish a causal link between protected activity and the adverse employment

action. To survive summary judgment on her retaliation claim, Everroad must present sufficient direct or circumstantial evidence for the trier of fact to infer that there was a causal link between the protected activity and her termination. *Antonetti*, 563 F.3d at 592. Under the direct proof methodology, a plaintiff may establish a *prima facie* case of retaliation by presenting direct evidence of statutorily protected activity, an adverse employment action, and a causal connection between the two. *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003). A plaintiff may employ the indirect method by showing that she engaged in statutorily protected activity, performed her job to her employer's legitimate expectations, suffered an adverse employment action, and was treated less favorably than similarly situated employees who did not engage in that protected activity. *Dear v. Shinseki*, 578 F.3d 605, 610-11 (7th Cir. 2009); *Haywood*, 323 F.3d at 531. We will assume for the purposes of the appeal that Everroad engaged in statutorily protected activity when she mentioned Mulligan's PMS comment to Scott and Everroad.[5] She clearly suffered an adverse employment action when she was terminated but her efforts on appeal to demonstrate a causal link between the two are non-existent. Although she criticizes the district court for addressing only tempo-

---

[5] We assume without deciding that this report was sufficient to alert Scott and Hantzis to the nature of Everroad's complaint. She was reporting to her employer only a single rude, childish remark (albeit a gender-based one) made by a co-worker who had no supervisory authority over her.

ral proximity, Everroad offers no other factual or legal theory linking her report about the PMS comment to her termination. Because we agree with the district court that a year is too long in the absence of any other evidence tying the protected activity to the adverse action, we also conclude that Everroad has failed to establish the requisite causal connection. *Haywood*, 323 F.3d at 532 (one-year delay between protected activity and termination is far too long to establish a causal link in the absence of any other evidence relating to causation). The court therefore correctly granted summary judgment in favor of the defendants on the retaliation claims.

AFFIRMED.