In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1647

CALVIN WHITING,

*Plaintiff-Appellant,*

*v.*

WEXFORD HEALTH SOURCES, INC.,
and ALFONSO DAVID,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 2917 — **Elaine E. Bucklo**, *Judge.*

ARGUED OCTOBER 26, 2015 — DECIDED OCTOBER 12, 2016

Before WOOD, *Chief Judge*, BAUER and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. While serving a probation-revocation sentence in an Illinois prison, Calvin Whiting fell ill with what turned out to be a rare form of non-Hodgkin's lymphoma. A prison doctor initially diagnosed an infection and prescribed antibiotics and nonprescription pain relievers. It

was not until two months later that the doctor ordered a biopsy and the cancer was discovered.

Whiting filed this lawsuit under 42 U.S.C. § 1983 against the prison doctor and the prison's private medical provider alleging that they were deliberately indifferent to his serious medical needs during the two months that his cancer went undiagnosed. The district court granted summary judgment to both defendants. We affirm.

## I. Background

Calvin Whiting violated the terms of his probation on an Illinois burglary conviction and was sent to the Shawnee Correctional Center in Vienna, Illinois, in July 2010. Wexford Health Sources, Inc., provides medical services for inmates in Illinois prisons. Dr. Alfonso David is the medical director at Shawnee. On October 15, 2010, Whiting went to the prison's medical center seeking treatment for pain in his left jaw, left ear, and groin; he also discovered nodules developing in these areas. A nurse examined him and thought he had an ear infection; she gave him amoxicillin (an antibiotic) and Motrin.

About a week later Whiting returned to the medical center complaining that his pain had worsened and the amoxicillin had given him a rash. He was given Bactrim, a different antibiotic, instead. Chest and abdominal x-rays also were ordered. Dr. David is listed as the prescribing physician for these orders, but it's not entirely clear whether he or the nurse saw Whiting that day.

Over the next few days, Whiting told two different nurses that his pain and the bumps were getting worse. The nurses gave him Tylenol and scheduled an examination with

Dr. David. On October 26 Whiting was sick enough to be admitted to the infirmary. Dr. David saw him the next day.

Dr. David's observations from the October 27 examination indicate that Whiting's pain was continuing (and possibly worsening), his lymph nodes were swollen, and he had developed a mass in his jaw. Dr. David ordered blood work and submitted a biopsy request to Wexford's "Collegial Review Committee." This "committee"—just Dr. David himself and one other physician—denied the biopsy request on November 1. The two doctors decided to try two different antibiotics (doxycycline and Augmentin), one after the other, and proceed with a biopsy if this course of treatment did not work. Dr. David implemented this treatment plan that same day. Whiting continued to receive nonprescription pain medication.

The first few days on the new antibiotic regimen showed promise: Two nurses reported some improvement in Whiting's condition. But by November 7 Whiting was reporting new bumps and increased pain. On November 29 a nurse observed many more bumps and scheduled another appointment with Dr. David. On December 2 Dr. David examined Whiting and resubmitted the biopsy request. It was approved four days later, and the biopsy was performed on December 21, almost two full months after Dr. David first submitted the biopsy request to the "committee." The results revealed that Whiting had a rare type of non-Hodgkin's lymphoma.

Dr. David referred Whiting to an outside oncologist, Dr. Mahnaz Lary, who diagnosed Stage IV SLK positive anaplastic large cell lymphoma, a rare and aggressive form of the disease. Chemotherapy began in early January 2011.

In June 2011 Whiting's lymphoma appeared to be in complete remission, but by August the disease had returned. Whiting began another round of chemotherapy. In October 2011 he was approved for a stem-cell transplant at Barnes Jewish Hospital in St. Louis. A scan in December 2011 showed the lymphoma again in remission.

Whiting's prison sentence ended in January 2012. After his release he received additional chemotherapy and a stem-cell transplant at the University of Chicago Medical Center. A biopsy in June 2012 brought bad news: the lymphoma was back. Since then Whiting has been receiving palliative chemotherapy and remains a candidate for another stem-cell transplant.

Whiting filed this suit against Dr. David and Wexford alleging that they were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.[1] His claim focuses on the period from late October 2010, when Dr. David first examined him, and early January 2011, when chemotherapy began. Whiting argues that the decision to postpone the biopsy and continue to treat him for an infection forced him to endure severe pain during this two-month period.

Both defendants moved for summary judgment. Dr. David argued that the evidence was insufficient to support an inference that he acted with the necessary culpable state of mind. Wexford argued that Whiting failed to produce evidence showing that his injury was caused by a policy or custom, a necessary element for liability under

---

[1] The suit named other defendants as well, but Whiting did not pursue his claims against them.

*Monell v. Department of Social Services*, 436 U.S. 658 (1978). The district judge accepted these arguments and entered judgment for the defendants.

## II. Discussion

We review the court's order granting summary judgment de novo, viewing the evidence and drawing all reasonable inferences in Whiting's favor. *Burton v. Downey*, 805 F.3d 776, 783 (7th Cir. 2015). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### A. Dr. David

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)) (citation omitted). To prevail on a deliberate-indifference claim, the plaintiff must prove that he suffered from "(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). Lymphoma is an objectively serious medical condition, and Whiting submitted expert testimony that he would have suffered significantly less pain during November and December of 2010 if a biopsy had been ordered and chemotherapy begun. As in many deliberate-indifference cases, the dispute rests on the second element of the claim.

A prison official is deliberately indifferent only if he "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The state-of-mind element is measured subjectively: The defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference. *Id.*; *see also Petties v. Carter*, No. 14-2674, 2016 WL 4631679, at *3 (7th Cir. Aug. 25, 2016) (en banc) ("[T]he Supreme Court has instructed us that a plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm."). The requirement of subjective awareness tethers the deliberate-indifference cause of action to the Eighth Amendment's prohibition of cruel and unusual punishment; "an *inadvertent* failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain.'" *Estelle*, 429 U.S. at 105 (emphasis added).

When a prison medical professional is accused of providing *inadequate* treatment (in contrast to *no* treatment), evaluating the subjective state-of-mind element can be difficult. It's clear that evidence of medical negligence is not enough to prove deliberate indifference. *Id.* at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Petties*, 2016 WL 4631679, at *3 ("[P]laintiffs must show more than mere evidence of malpractice to prove deliberate indifference."); *see also McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013); *Duckworth*, 532 F.3d at 679 ("Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts."); *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) ("[N]either medical malpractice nor a mere disagreement with a doctor's medical judgment amounts to deliber-

ate indifference."). So without more, a mistake in professional judgment cannot be deliberate indifference.

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Zaya v. Sood*, No. 15-1470, 2016 WL 4621045, at *3 (7th Cir. Sept. 6, 2016).

On the other hand, "where evidence exists that the defendant[] knew better than to make the medical decision[] that [he] did," then summary judgment is improper and the claim should be submitted to a jury. *Petties*, 2016 WL 4631679, at *5. State-of-mind evidence sufficient to create a jury question might include the obviousness of the risk from a particular course of medical treatment, *id.* at *4; the defendant's persistence in "a course of treatment known to be ineffective," *id.*; or proof that the defendant's treatment decision departed so radically from "accepted professional judgment, practice, or standards" that a jury may reasonably infer that the decision was not based on professional judgment, *id.* (quotation marks omitted).

No evidence in this case supports an inference that Dr. David "knew better" than to pursue the course of treatment that he did. He explained in his deposition that alt-

hough he considered the possibility of lymphoma, he thought Whiting had an infection and treated him for that condition, putting off an invasive biopsy until it was clear that aggressive antibiotic treatment wasn't working. Whiting argues that Dr. David's decision on November 1 to try two more antibiotics when the first two were ineffective is sufficient for a jury to infer that the doctor was deliberately indifferent. But no expert testified that Dr. David's chosen course of treatment was a substantial departure from accepted medical judgment, and the decision was not so obviously wrong that a layperson could draw the required inference about the doctor's state of mind without expert testimony.

Our decision in *Duckworth* is instructive on this point. There we confronted a claim that two prison physicians should have ordered a cystoscopy to rule out bladder cancer as soon as they noticed blood in the plaintiff's urine. The first physician didn't suspect cancer; the second physician was aware of the cancer risk but thought that the plaintiff had another condition and pursued a course of treatment consistent with that diagnosis. 532 F.3d at 680–81. The plaintiff provided expert testimony from an experienced urologist that cancer should always be ruled out when a patient has blood in his urine. *Id*. at 681. We held that the expert's testimony showed only "how a reasonable doctor would treat Duckworth's symptoms, but it [did] not shed any light into [the defendant's] state of mind." *Id.* In other words, it "just … reiterate[d] the standard for medical malpractice, which falls short of deliberate indifference." *Id.*

The evidence here falls even further short of what's required. Whiting doesn't have *any* expert testimony indicating that Dr. David's infection diagnosis and concomitant

treatment plan departed from accepted medical practice, much less *substantially* so.

Whiting compares his case to *Hayes v. Snyder*, 546 F.3d 516 (7th Cir. 2008), but the similarities are superficial. The prison physician in *Hayes* gave the plaintiff an antibiotic and Tylenol III for obvious and excruciatingly painful testicular cysts; he also refused to authorize a referral to a specialist. Unlike this case, the plaintiff in *Hayes* produced considerable evidence showing that the physician's choice of treatment was not based on a mere mistake in professional judgment. For example, the physician—the medical director at the prison—acknowledged in his deposition that other prison doctors who saw the plaintiff ordered prescription-strength pain medication and a referral to a specialist. *Id*. at 524. The defendant's approval was required before these steps could be taken, but he "refused to give that approval," asserting an after-the-fact justification that he didn't have the proper paperwork. *Id.* He also claimed, implausibly, that he "wouldn't know which specialist to send [the plaintiff] to" without more clinical information. *Id*. at 526. We concluded on these facts that the evidence was sufficient for a fact finder to conclude that the doctor was subjectively indifferent to the plaintiff's medical needs. *Id*.

Here, in contrast, the record contains no evidence from which a jury could infer that Dr. David was subjectively indifferent to Whiting's condition—in short, that Dr. David *knew* that the additional antibiotics would be ineffectual but persisted in this course of treatment anyway. Without expert testimony a lay jury could not infer that because amoxicillin and Bactrim did not work, it was *obvious* to Dr. David that the doxycycline and Augmentin also would fail. To survive

summary judgment Whiting needed to present evidence sufficient to show that Dr. David's decision was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). He did not do so. The district court properly granted summary judgment for Dr. David.

## B. Wexford

Whiting's claim against Wexford meets the same fate. Wexford is a private corporation, but we've held that the *Monell* theory of municipal liability applies in § 1983 claims brought against private companies that act under color of state law. *Shields v. Ill. Dept. of Corr.*, 746 F.3d 782 (7th Cir. 2014) (noting every circuit court that has addressed the issue has extended the *Monell* standard to private corporations acting under color of state law). To prevail on his *Monell* claim, Whiting needs to show that Wexford's policy, practice, or custom, caused a constitutional violation. *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 294, 303 (7th Cir. 2009). This requirement can be satisfied by evidence that "an official with final policy-making authority" acted for the corporation. *Id*. That's the theory Whiting invokes on appeal: He argues that Dr. David was a final policymaker for Wexford.

But Whiting's filings in the district court weren't entirely clear on this point, so the argument is probably waived. *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 480 (7th Cir. 2010). Waiver aside, the claim fails on the merits for two independent reasons.

First, Dr. David did not have final policymaking authority in the relevant sense. He may have had the final say on

Whiting's treatment plan and thus was the final *decision-maker* with respect to his care, but that's not nearly enough to show he was the final *policymaker*. *See Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009) (noting difference between having decision-making authority for some decisions and having the responsibility "for establishing final government policy on a particular issue").

Second, Whiting's theory of *Monell* liability is contingent on a finding that Dr. David, the ostensible final policymaker, was individually liable for deliberate indifference. Our decision in *Thomas* makes clear that *Monell* liability does not always require a finding of individual liability. 604 F.3d at 305. But if the plaintiff's theory of *Monell* liability rests entirely on individual liability, as Whiting's does here, negating individual liability will automatically preclude a finding of *Monell* liability. *Id.*

AFFIRMED.

WOOD, *Chief Judge*, concurring in part and dissenting in part. Calvin Whiting is suffering from a deadly disease: a rare form of non-Hodgkin's lymphoma. The Mayo Clinic's website describes this as "a cancer that originates in your lymphatic system," and then spreads throughout the body. See Non-Hodgkin's lymphoma, Definition, MAYO CLINIC, http://www.mayoclinic.org/diseases-conditions/non-hodg-kins-lymphoma/basics/definition/con-20027792 (last visited Oct. 12, 2016). Whiting fell ill while he was serving a sentence in Illinois's Shawnee Correctional Center for a probation violation, and so of necessity he turned for help to the prison doctors. Dr. Alfonso David, the medical director at Shawnee and an employee of Wexford Health Sources, Inc., the company that holds the contract for medical services at that institution, was Whiting's treating physician.

It took Dr. David almost two months from Whiting's first visit to the infirmary in mid-October 2010 to get approval for a biopsy of nodules in Whiting's swollen lymph nodes, even though he had power to order one if he deemed it an "emergency." Despite the fact that Whiting presented not only with pain in his left jaw and his ear, but also with nodules and pain in his *groin*, a nurse at Shawnee thought he had an ear or throat infection and gave him amoxicillin (plus Motrin for his pain). The amoxicillin caused a rash, and so a few days later Dr. David switched him to Bactrim and ordered chest and abdominal x-rays. Those results showed enlarged cervical (neck) nodes and a mass in Whiting's left jawbone. Whiting was also complaining of severe pain. It was then that Dr. David suggested a biopsy of the nodules to a second colleague, who vetoed that course. (Defendants describe this as submission to a "review committee," but that is a bit grandiose for a

simple process through which one doctor consults with a second and allows the second to override his recommendation.)

During November and December, Dr. David continued with the fruitless course of antibiotics, although he changed the particular drugs to doxycycline and Augmentin. In early December, he again suggested a biopsy to the other colleague. This time the two agreed to order the biopsy. It was performed on December 21 and revealed that Whiting had Stage IV SLK positive anaplastic large cell lymphoma. (A group called the Lymphoma Research Foundation describes this as a rare type of aggressive T-cell lymphoma, which can progress rapidly without treatment. See LYMPHOMA RESEARCH FOUNDATION, http://www.lymphoma.org/site/pp.asp?c=bkLTKaOQLmK8E&b=6293639 (last visited Oct. 12, 2016).) Whiting began chemotherapy at that point and has continued his battle with cancer, cycling between remission and relapse.

Focusing only on the two months between his first visit to Dr. David and the start of his chemotherapy, Whiting sued both Dr. David and Wexford, contending that the care he received violated his Eighth Amendment right to be free from cruel and unusual punishment. See *Estelle v. Gamble*, 429 U.S. 97 (1976). During that period, he contends, he was in severe pain and his cancer was going untreated. Dr. David knew that Whiting was suffering and that a biopsy was necessary, yet he proceeded on a "business as usual" basis. Dr. Nancy Bartlett, who treated Whiting later at Barnes Jewish Hospital in St. Louis, described this delay in treatment as "cruel and unusual." Whiting's treating oncologist after his release from Shawnee, Dr. Justin Kline, said much the same thing. Dr. Kline opined that if chemotherapy had been started right away, it would have had two desirable effects: alleviation of Whiting's

pain and destroying the cancer. He also declared that Whiting "would not have experienced the pain he did between October 27, 2010, and January 2011" if the biopsy had been performed when Dr. David first mentioned that possibility.

The district court granted summary judgment for both defendants, and my colleagues have voted to affirm. I agree with them that Whiting's case against Wexford was properly rejected, but, without taking any position on the ultimate outcome, I would reverse and remand for further proceedings against Dr. David.

It is well established that a prisoner asserting an Eighth Amendment claim based on the medical care he received must show two things: first, that he has a serious medical need, and second that the defendant was deliberately indifferent—not merely negligent or oblivious—to his needs. *Gamble*, 429 U.S. at 104; see also *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). I focus here only on the subjective element of the test, because all members of this panel agree with the district court that there was enough evidence to reach a jury on the objective element. This is the same type of case as the one we considered in *Petties v. Carter*, No. 14-2674, 2016 WL 4631679 (7th Cir. Aug. 25, 2016) (en banc), in which the inmate received *some* medical care, but the facts permit more than an inference of medical malpractice—they permit an inference of deliberate indifference.

The critical point that *Petties* established is that the furnishing of some care does not automatically defeat an Eighth Amendment claim (raised through the Fourteenth Amendment for a state prisoner). Instead, as *Petties* held, it is essential to "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference

to serious medical needs." *Id.* at *3. We went on to say that "[i]f a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it." *Id.* Acknowledging that the line between (minimally) competent medical judgment and deliberate indifference can be difficult to draw, we gave several examples of situations in which a finding of an Eighth Amendment violation is possible. At least two of them fit Whiting's allegations: "[persistence] in a course of treatment known to be ineffective," *id.* at *4, and the choice of "an easier and less efficacious treatment without exercising professional judgment," *id.* at *5 (internal quotation marks omitted). We summarized the central point as follows:

> [R]epeatedly, we have rejected the notion that the provision of some care means the doctor provided medical treatment which meets the basic requirements of the Eighth Amendment. Rather, the context surrounding a doctor's treatment decision can sometimes override his claimed ignorance of the risks stemming from that decision. When a doctor says he did not realize his treatment decisions (or lack thereof) could cause serious harm to a plaintiff, a jury is entitled to weigh that explanation against certain clues that the doctor *did* know.

*Id.*

In my view, the rule most recently reaffirmed in *Petties* (dating back to *Gamble*) governs Whiting's case. It would be possible on this record for a jury to conclude that Dr. David was exercising his medical judgment over the critical period, even if that judgment was mistaken or even negligent. He saw

Whiting on several occasions; he tried various antibiotics, which he says he regarded as conservative responses to Whiting's symptoms, and the antibiotic treatments at times seemed to be having some positive effect. He did not perceive Whiting's situation to be an emergency, and so he did not exercise his limited authority to order a biopsy on his own. Instead, he invoked the "Collegial Review Committee" process described above.

But that is not the only inference that is possible from these facts. Whiting has brought forth evidence that would permit a trier of fact to infer deliberate indifference. No one, Dr. David included, paid any attention to the fact that nodules were not limited to Whiting's neck and face, but instead were also in his groin. A jury could conclude that Dr. David paid no heed to the fact that the antibiotics and Motrin he was prescribing for Whiting's pain were, by Whiting's account, utterly ineffective. Had he checked the medical records, he would have seen that Whiting repeatedly informed Shawnee's medical unit that he was in extreme pain. In *McGowan v. Hulick*, 612 F.3d 636 (7th Cir. 2010)—decided *before* Whiting's first complaint about nodules in his left jaw and groin, and accompanying pain—we reaffirmed that "[a] delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Id.* at 640 (citing *Gamble*, 429 U.S. at 104–05); *Gayton v. McCoy*, 593 F.3d 610, 619 (7th Cir. 2010); and *Edwards v. Snyder*, 478 F.3d 827, 832 (7th Cir. 2007). See also *Petties*, 2016 WL 4631679 at *5; *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011). A delay when the physician recognizes that the condition may be life-threatening (as Dr. David did, given his initial request for a biopsy) is even more troublesome. Perhaps if Dr.

David had tried one or two courses of antibiotics before moving to more serious measures, this case would be different. But a jury could find that it was apparent by the time the third and fourth antibiotics were tried that this course of treatment was ineffective for both the underlying condition and the pain.

Finally, the existence of the so-called collegial review mechanism does not compel summary judgment in favor of Dr. David. It is, in effect, a device to obtain a second opinion. As the record presently stands, it is unclear whether the second doctor's "no" automatically trumps the treating physician's judgment that a procedure is necessary (a situation that would undermine a finding of deliberate indifference on the first doctor's part), or if the second doctor just has an opportunity to persuade the first doctor to reconsider his opinion. The former does not strike me as "collegial," and the latter is not something that deserves to be called a "review." Nothing reveals whether, or why, Dr. David changed his mind about the need for a biopsy at the end of October. Taking the facts and reasonable inferences from them in the light most favorable to Whiting, I must assume that Dr. David saw no reason to invoke his authority to override the second doctor and obtain a biopsy on an urgent basis. A jury would be entitled to infer deliberate indifference to Whiting's serious medical need on the basis of those facts.

Looking at the record as a whole in the light most favorable to Whiting, I conclude that summary judgment in Dr. David's favor should not have been granted. I therefore dissent to that extent and would order further proceedings on this part of the case.