NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 13, 2016
Decided February 3, 2017

**Before**

RICHARD A. POSNER, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 15-3603

| | |
|---|---|
| ANTHIMOS GOGOS, | Appeal from the United States District |
|     *Plaintiff-Appellant*, | Court for the Northern District of Illinois, Eastern Division. |
| | |
|     *v*. | |
| | No. 13 CV 3779 |
| AMS MECHANICAL SYSTEM, INC. | |
|     *Defendant-Appellee*. | Manish S. Shah, *Judge*. |

**O R D E R**

Anthimos Gogos alleges that his former employer AMS Mechanical System, Inc., violated his rights under the Americans with Disabilities Act, 42 U.S.C. § 12112(a), by firing him for asking to leave work early for treatment of his hypertension. The district court granted summary judgment for AMS, reasoning that Gogos's supervisor did not know he had a disability. We affirm the judgment on a different ground. Even if the supervisor knew of his disability, a reasonable fact finder would have to conclude that Gogos was fired for insubordination, not his disability.

**I. Background**

Gogos, a Greek and French citizen who speaks broken English, worked as a welder and pipefitter for AMS on subcontracted projects to build a new plant at a BP refinery in Whiting, Indiana. After satisfactorily completing pipefitting work at the refinery, AMS rehired him eight months later to perform more pipefitting. Gogos reported to two forepersons whose supervisors were Don Henson, a general foreman, and Tom Dubsky, AMS's superintendent at the refinery.

AMS required its pipefitters to notify their foreperson if they needed to leave work early. During the first month of his second tour with AMS, Gogos left early for doctor's visits on three occasions. Each time he informed his foreperson, who in turn notified Henson. After Gogos's third early departure, Henson complained to Dubsky that Gogos "was leaving to go to the doctor, numerous times." No evidence suggests, however, that Henson knew the reasons for these doctor visits. Dubsky reminded Henson that AMS policy required a doctor's note when Gogos visited a doctor on company time.

Near the end of this first month, Gogos became ill from hypertension. His coworkers noticed that his right eye was very red. When he experienced a loss of vision and high blood pressure at work two days later, he asked his foreperson for permission to obtain immediate medical attention. He wrote in a note: "[A]s you know, my blood pressure is high. My right eye is red. I lose vision on and off, I need - - I would like to take my day off to go see a doctor." The foreperson told Henson that Gogos was leaving to go to the doctor. Henson responded, "Really[,] … I'll take care of it."

Henson then spoke to Gogos about his request to leave work early. Gogos told him, "I'm not working today. I'm going to the hospital. Can you please call the bus? Call the bus. Hopefully I can make it safe." (A company bus shuttled AMS workers between the job site and the parking lot.) Gogos continued, "[A]s you know, my eye's red, lose vision, blood pressure's too high, I have to go see a doctor." Henson denies that Gogos told him that his vision deteriorated and that he had high blood pressure, but on summary-judgment review, we accept Gogos's account.

Henson asked Gogos to bring a doctor's note when he returned to work. At this, Gogos became agitated and belligerent. Henson responded by explaining that "[l]ately, you're taking too much time off your job without [a] doctor's excuse. If I will let you go [to the doctor], are you going to bring tomorrow a doctor's excuse?" Gogos, still agitated,

replied, "I'm not sure I can make it to the hospital. So why are you asking me that question?" Gogos does not deny that Henson asked him to provide a doctor's note documenting the reason for his visit. Nor does he deny that he rebuffed this request, asserting that he did not work for Henson. Henson then warned him: "[I]f you come in tomorrow and you don't have a doctor's note for a reasoning [sic] that you're leaving, you will probably be terminated at that time." In response Gogos yelled, "You cannot fire me." Henson clarified, "I'm not firing you. I'm asking you for a doctor's note. It's a simple request. If you cannot provide me with a doctor's note, I'm going to have to let you go because I need to know the reasoning [sic] that you're missing this time."

Gogos then became profane and continued to defy Henson's request for a doctor's note. He screamed, "I'm not fucking give [sic] you anything." Henson responded, "Well, you might as well just grab your stuff when you go to the doctor's, you're done." Gogos shouted, "You cannot fucking fire me." He also told Henson that he was recording their conversation (untrue), and Henson admonished him that he could be fired for violating BP's rule prohibiting cell phones inside the plant. After Gogos again heatedly refused to bring a doctor's note, Henson said, "You are fired." As Henson turned away, Gogos grabbed him by the shoulder to turn him around, repeating, "You cannot fucking fire me." Henson responded, "[D]o not put your hands on me. That's not tolerated. At this point you are fired." Gogos denies that he became physical with Henson, but he does not support his denial with citations to any record evidence, such as his own testimony, as is his duty; without supporting citations, his bare denial is ineffective. *See* FED. R. CIV. P. 56(a); *Smith v. Lamz*, 321 F.3d 680, 682–83 (7th Cir. 2003) (explaining that when a party opposing summary judgment does not cite to admissible evidence in denying facts asserted in the moving party's statement of undisputed facts, they are deemed admitted).

Gogos then visited the onsite medical facility, which diagnosed him with elevated blood pressure. Before Gogos left the worksite, Henson completed discharge paperwork and gave Gogos a form saying that he was being let go for "excessive absenteeism" and "tardiness." Henson also checked a box on the form for "voluntary resignation." Henson, a member of the same union as Gogos, explained that he checked that box because he "didn't want to ruin Gogos's chances of getting another job." Later that day a doctor determined that Gogos suffered from chest pain, chronic obstructive pulmonary disease, heart disease, and insufficient oxygen reaching part of his brain.

Shortly after receiving this first discharge notice, Gogos received a second form from AMS. This one, signed by AMS's timekeeper, attributed the discharge to a

reduction in AMS's workforce. Before receiving this form, Gogos had called an AMS employee and asked him to change the reason on his original discharge notice from "termination" to "layoff" so that he could receive unemployment compensation. The timekeeper testified that he had indeed received a call from an employee who said that Gogos should be listed as laid off.

Gogos sued AMS alleging that he was fired because of a disability in violation of the ADA. In an earlier appeal, we ruled that Gogos's impaired vision and high blood pressure qualify as covered disabilities. *See Gogos v. AMS Mech. Sys., Inc.*, 737 F.3d 1170, 1172–73 (7th Cir. 2013). AMS then moved for summary judgment, contending that Henson did not know of Gogos's hypertension, that Gogos was not a qualified individual with a disability, and that AMS fired Gogos for refusing to supply a doctor's note and for grabbing Henson. Accepting the first argument, the district court granted summary judgment for AMS.

## II. Discussion

To defeat summary judgment, Gogos needed evidence that Henson knew that he had a disability and fired him because of it. *See* 42 U.S.C. § 12112(a); *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 (7th Cir. 2015); *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995). The record contains sufficient evidence to create a jury question on the first element. Gogos testified in deposition that during his heated exchange with Henson, he said he needed to go to the hospital for treatment of his high blood pressure and loss of vision. And Dubsky testified that Henson told him that Gogos had left his worksite on prior occasions for doctor appointments. Viewing this evidence in the light most favorable to Gogos, a jury could reasonably conclude that Henson knew about Gogos's disability.

AMS contends, however, that we can affirm based on the uncontradicted evidence that Gogos was fired for insubordination—that is, for swearing, grabbing Henson by the shoulder, and belligerently defying his reasonable request for a treatment note. AMS is correct. No evidence contradicts Henson's account of the critical moments in the sequence of events surrounding the discharge: After Gogos repeatedly and profanely refused Henson's request for a doctor's note, Henson immediately fired him. Henson's request was lawful because employers may require medical evidence of an employee's asserted disability. *See Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 482 (5th Cir. 2016); *EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1094–95 (6th Cir. 1998). And an employer may fire a worker for insubordinately disobeying a reasonable

work request or for grabbing a supervisor. *See Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 478 (7th Cir. 2010); *Williams v. Airborne Exp., Inc.*, 521 F.3d 765, 767–68 (7th Cir. 2008); *Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005); *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 777 (8th Cir. 2012). In short, a reasonable fact finder would have to conclude that Henson fired Gogos because he grabbed Henson and profanely disobeyed a lawful request for a treatment note. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (explaining that an employer would be entitled to judgment as a matter of law in a discriminatory-discharge case "if the record conclusively revealed … [a] nondiscriminatory reason for the employer's [termination] decision").

Moreover, it would be strange to subject AMS to possible liability for violating the ADA when Henson was trying to *comply* with the terms of the statutory scheme by asking for a doctor's note. Once an employee has reported a disability, the employer has a duty to work with the employee to determine a proper accommodation. *See Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). A doctor's note would have facilitated the required interactive process between Gogos and AMS to determine a reasonable accommodation for Gogos, especially given his poor English. But Gogos's defiance abruptly halted this process.

Gogos's responses are unavailing. First, he argues that AMS ignored its policy of allowing absences for illness. But far from ignoring its policy, AMS was trying to enforce it by asking Gogos for documentation that his absence was indeed illness related. Second, Gogos identifies a supposedly comparable worker who missed work but was not fired. But Henson did not fire Gogos for threatening to leave work. Henson fired him only after he belligerently flouted a reasonable request for a medical note and became physical and profane. Third, Gogos highlights AMS's differing explanations for the termination. But the variation in the discharge forms—attributable in part to Gogos's own request that his paperwork be changed to reflect a layoff rather than a termination—suggests only that these forms alone do not reveal the true reason for the discharge. Henson's uncontradicted account of the confrontation identifies the real reason: AMS fired Gogos because of his insubordination.

AFFIRMED.